Wallace Pierce, Frank Pierce, James Pierce and Walter Pierce v. Jonas J. Pierce.

*Mutuality—Constructive trusts—Fraud must be proved—Receiver.*

1. Mutuality is essential to a contract; if no basis appears upon which one who has taken a lease can charge others with its obligations, the latter cannot charge him with having taken it in the common interest and claim rights under it.

2. A case of constructive trust must rest on fraud, either actually intended or resulting from a failure to recognize and observe the rules of business integrity.

3. All presumptions are against fraud; it cannot be lightly charged against one in whom implicit confidence has been placed, especially if a near relation; such a person is fairly entitled to a favorable construction of any conduct that is reasonably consistent with integrity,

and an accusation that may seriously affect his business reputation should not be held proved by circumstances that are merely ambiguous.

4. An intestate left a large property which for several years his five sons managed for the common benefit. It was at length divided, and certain mining property was set off to the son who had had it in charge and who had already taken a lease of adjacent mining lands. The division was not satisfactory and was so amended afterwards that each of the five sons was given an interest in the original mine. The one who had taken the lease, however, claimed exclusive control of the leased property, while his brothers insisted that as it had been explored and worked at the joint expense, and the accounts of the two mines had been commingled, it must be considered as held in trust for all. They accordingly filed a bill against him to enforce such a trust. *Held*, that as the accounts had only been commingled during the period when defendant had supposed the mine to be his exclusive property under the partition; and as defendant, though in charge of the original mine for the common benefit was under no obligation to give his whole time to it, and might therefore engage in private ventures; and as defendant's fraudulent misrepresentation, if any, of the value of the mine for the purpose of getting it for less than it was worth, was of no effect after the final partition among all,—the bill would not lie.

5. A receiver ought not to be appointed in a proceeding for the partition of property theretofore left in the hands of one of the parties to manage in the common interest, if there is no allegation against him of insolvency; but if he objects to the appointment of a receiver he cannot, pending farther proceedings, charge for his services.

Appeal from Marquette. (Grant, J.)   Oct. 16.—Jan. 21.

BILL to establish and enforce constructive trust.   Defendant appeals.   Reversed.

*W. P. Healy* for complainants.   When a firm takes possession of land and spends money on it, it becomes partnership property even if the title is taken in the name of only one : *Way v. Stebbins* 47 Mich. 297; in mining partnerships where several agree orally to be partners in exploring and developing property a discovery by one inures to the benefit of all: *Hirborun v. Reeding* 3 Mont. 15; *Welland v. Huber* 8 Nev. 207 ; *Murley v. Ennis* 2 Col. 300 ; *Melton v. Lambard* 51 Cal. 259 ; *Settembre v. Putnam* 30 Cal. 494 ; a mining partner must exercise the utmost good faith toward his associates: Blanchard and Weak's Mining Cases 565 ; *Levi v. Karrick* 13 Ia. 344 ; *Pomeroy v. Benton* 14 Am. L.

Reg. (N. S.) 306; an existing partnership can buy real estate with partnership funds and for partnership purposes, whoever takes the title: *Williams v. Gillies* 75 N. Y. 201; *Fairchild v. Fairchild* 64 N. Y. 475; Pars. Partnership 363; *Washburn v. Washburn* 23 Vt. 576; *King v. Hamilton* 16 Ill. 196; the manager of a mining company has no right to run another in rivalry with it: *Bast's Appeal* 70 Penn. St. 301; *Marshall v. Johnson* 33 Ga. 500; *Amer. Bank Note Co. v. Edson* 56 Barb. 84: 1 Lans. 388; and his partners in the first mine can claim a share in the profits of the other: *Sexton v. Sexton* 9 Grat. 204; *Lockwood v. Beckwith* 6 Mich. 173; *Eakin v. Shumaker* 12 Tex. 21; *Forrer v. Forrer* 29 Grat. 134; *Wellford v. Chancellor* 5 Grat. 39; *Catron v. Shepherd* 8 Neb. 308; an agent cannot take a position opposed to his principal's interest: *People v. Overyssel* 11 Mich. 225; *Flint & Pere Marq. Ry. v. Dewey* 14 Mich. 488; *Moore v. Mandlebaum* 8 Mich. 433; whatever has the effect of fraud in the management of a trust must be treated as fraud: *Bibb v. Pope* 43 Ala. 201; *Cumberland Coal Co. v. Parish* 42 Md. 605; an agent's profits in a business opposed to the principal's are for the principal's benefit: *Dutton v. Willner* 52 N. Y. 319; Dunlap's Paley's Agency 51; Storey on Agency §§ 207–214; *Moore v. Moore* 5 N. Y. 256; *Dodd v. Wakeman* 26 N. J. Eq. 484; *Yates v. Arden* 5 Cr. C. C. 526; *Ringo v. Binns* 10 Pet. 269; neither a partner nor an agent can take the renewal of a lease about to expire, in his own name: *Anderson v. Lemon* 8 N. Y. 237; *Moody v. Mathews* 7 Ves. 185; *Featherstonhaugh v. Fenwick* 17 Ves. 298; *Leach v. Leach* 18 Pick. 68; *Struthers v. Pearce* 51 N. Y. 361; *Mitchell v. Read* 61 N. Y. 123; 61 Barb. 310: 84 N. Y. 556; no one can purchase an interest in property and hold it for his benefit where he has a duty to perform in relation to it that is inconsistent with his character as purchaser: *Van Epps v. Van Epps* 9 Paige 241; *Fulton v. Whitney* 66 N.Y. 552; *Bain v. Brown* 56 N. Y. 288; *F. & M. Bank v. Downey* 53 Cal. 468; a constructive trust arises by implication of law: *Lacy v. Hall* 37 Penn St. 365; *Ferris v. Van Vechten* 73 N. Y. 119; *Oliver v. Piatt* 3 How. 401; such trusts are not abolished in Michigan: How. Stat. §§ 5568–71; near relations are not expected to assert their rights as promptly as strangers: *Wright v. Wright* 37 Mich. 57; *Brooks v. Martin* 2 Wal. 87.

*Ball & Hanscom* for defendant appellant. Business associates after letting one of their number expend money upon

a venture until they can see whether it is going to pay, cannot then claim the benefits of it : *Truesdail v. Ward* 24 Mich. 134 ; *Russell v. Miller* 26 Mich. 1 ; *Peake v. Thomas* 39 Mich. 589 ; *Case v. Erwin* 18 Mich. 434 ; *Slocumb v. C. B. & Q. R. R.* 57 Ia. 675 ; *Walker v. Flint* 3 McCrary 507 ; whether they intended to ratify his acts or not : *Manley v. Saunders* 27 Mich. 347 ; *Vanneter v. Crossman* 42 Mich. 465.

COOLEY, C. J. The purpose of the bill in this case is to enforce a trust in lands arising by implication of law from the alleged fraud of the defendant.

The parties to the suit are brothers, and heirs-at-law of James Pierce who died intestate at Sharpsville in Pennsylvania, December 2, 1874. His estate was a large one, and included railway and banking interests, coal lands and a blast furnace in Pennsylvania, and mining interests in Marquette county in this State. Shortly after his death it was agreed between his widow and his five sons that Wallace and Jonas should be appointed administrators, but that the estate for some time should be neither sold nor divided, and that each son should take charge of some portion of the estate and manage it for the common benefit. Under this agreement the mining interests in Marquette county were put in charge of defendant, who continued to be manager thereof until April, 1881, when an amicable partition was made of the estate, except that the Marquette mining property was not divided and was still left in defendant's charge.

The bill in this case avers that James Pierce in his lifetime purchased a large amount of stock in the S. C. Smith Iron Mining Company, then operating an iron mine in Marquette county. He also advanced a large sum of money to that corporation to enable it to carry on its business. The corporation however fell into financial difficulties and went into bankruptcy, and in 1878 the said Wallace and Jonas as administrators purchased its real estate and commenced mining operations and operated a saw-mill thereon by consent of all the heirs. The mine was then called the Cheshire mine.

The bill further avers that in the year 1879 the defendant

suggested the propriety of making explorations on the north line of the Cheshire mine property for iron ore, and it was agreed that defendant should endeavor to get a lease of the property adjoining on the north for the benefit of the estate, for the purpose of mining iron ore for a royalty; that such lands at the time were of little known value, but the heirs were willing to expend some money in explorations thereon; that defendant informed the others that he could not take such a lease as administrator, but would take it in his individual name for the benefit of all, to which the other heirs assented; that he thereupon did procure such a lease, and the heirs took possession, and commenced operations thereon, calling the leased lands the North Cheshire; that within a year five thousand dollars were expended thereon, without apparent valuable result, and the cost charged to the profit and loss account of the Cheshire mine,—the Cheshire and North Cheshire being treated by all parties as one property.

The bill then states the negotiations for a partition of the estate between the heirs, which was accomplished in April, 1881. In the course of these defendant proposed to take the Marquette mining property at ten thousand dollars, he representing that the property as a mine was valueless, and could only be regarded as wild land with a saw-mill thereon and certain property for mining purposes at the mine; that afterwards in November or December, 1880, complainant Frank Pierce proposed to take half the Marquette property, to which defendant assented, but in January or February following defendant said he would not take it at his valuation until he had seen it again, and in March he went to Marquette and on his return wanted to take to himself exclusively all the Marquette mining property that belonged to the estate. Complainants, however, had been investigating its value and had learned that the profits for the last year had been seven thousand five hundred dollars, and thereupon insisted on taking said property with defendant in equal shares. They charge defendant with keeping them in ignorance of the value of the property in order to obtain it himself at a nominal valuation. The result of the negotiations was that the

five brothers were left joint owners of the Cheshire mine while the other property was divided.

The bill then avers that for the first time the defendant, on April 5, 1881, informed complainants that the lease of the North Cheshire property was his and he should keep it as his own; to which they objected and protested, claiming that the North Cheshire was developed into a mining property from wild land, by the money and exertions of complainants and defendant in common, and that they regarded and should continue to regard it as common property. Up to this time they had had implicit confidence in defendant, but they charge that he used his position as manager of the common property to obtain possession of the North Cheshire, and in the absence of complainants, in April, 1881, he directed the book-keeper of the Cheshire to separate the amounts expended on the North Cheshire from the Cheshire, which they protested against when it came to their knowledge, and refused to ratify the action.

The bill then prays that the Cheshire mine property be sold under the order of the court, and the proceeds divided; that defendant render an account in respect to the North Cheshire property, now called the Swanzey; and that a receiver be appointed pending the suit, and commissioners to make partition.

The answer admits the arrangement for carrying on the Cheshire mine for the benefit of all the heirs, but avers that in the spring of 1880 a division of the property of the estate among the several parties entitled thereto was agreed upon, under which defendant was to have the mining property in the county of Marquette at the value of ten thousand dollars. He was also to have one-half the accounts of the mine, the other half being set over to complainant Frank Pierce. At that time the entire property of the estate was appraised, and a division of the whole agreed upon. No conveyances were then made, but the parties entered into possession of the greater part of the portions assigned to them respectively, and managed and carried them on as their individual property. The division was to date from April 1, 1880, and each

received the profits of his portion from that time. The Marquette mining property was considered to belong to defendant from that time ; but in the latter part of the following December complainant Frank Pierce decided that he wanted a one-half interest in the same, and defendant agreed thereto, and such changes were made in the division of the estate as were rendered necessary thereby. Early in the following spring the other complainants became dissatisfied with the valuation of the property as it had been agreed upon, and insisted upon a change in the division, which defendant declined to assent to, but finally, about the 5th of April 1881, it was agreed between defendant and complainants that they should all take equal interests in said mining property subject to all the liabilities, and with all the profits accruing thereto from the 1st of April 1880, and that defendant and Frank Pierce should have each a half interest in the accounts of the mine up to that date. This division was consummated by deed and defendant was left in the management.

The answer further states that in the year 1879, by mutual agreement of the parties, explorations were entered upon on their common property to find other ore if possible, as the old mine appeared to be about worked out. A shaft was sunk and other work done near the north line of the property, and up to the division of April 1st, 1880, about eleven hundred dollars had been expended in these explorations. Thereafter the defendant continued them on his own account expending sixteen hundred dollars in addition to what had been expended before, and during that year, with a view of taking a lease of the property adjoining on the north, he expended about one thousand dollars upon that. All the accounts of explorations, both upon the Cheshire mining property, and upon that to the north were kept together on the books of defendant, who in the division as it then stood was the owner of the Cheshire mine, but the accounts were separated after the change in the division in December, when it was agreed that Frank Pierce should take a half interest in the Cheshire mine, and after the final division about April 5th, 1881, whereby all the

parties became equally interested in the Cheshire mine, the sum which had been expended on the North Cheshire property was charged over on the books to defendant. From the date last mentioned the mining business on the Cheshire mining property was carried on by all the parties as a partnership, under the name of " The Cheshire Iron Company," and that upon adjoining land to the north was carried on by defendant alone under the name of " The North Cheshire Mine."

The defendant denies positively that he ever undertook to obtain a lease or leases for the benefit of the estate, in his own name or otherwise. He avers that he commenced efforts to obtain the property since called " The North Cheshire " property and now the Swanzey, after the division of 1880, and while the Cheshire mine was understood to be his own ; that he did not ascertain all the owners until July of that year, and did not obtain a contract for a lease until in November following. He denies all misrepresentation or deception in respect to the Cheshire mine, and avers that the accounts of the mine were kept at Sharpsville, Pennsylvania, where the complainants had access to them at all times. He says he always claimed the North Cheshire property as his own after he acquired it, and denies any equitable claim on the part of complainants to any participation therein.

The case was heard on pleadings and proofs and decree rendered affirming the right of complainants to an equal participation with defendant in the " North Cheshire " mine property, and for an accounting and partition. A reference for the appointment of a receiver was also ordered.

From this abstract of the pleadings it will appear that the case for complainants depends upon their establishing the fact that defendant, when he took a lease of the property since known as the North Cheshire mining property, and now as the Swanzey, took the same under circumstances which charged it with a trust in his hands for the benefit of complainants. The bill avers an understanding that it was to be and was acquired by defendant for the common benefit of all the heirs ; but it also makes out a case of constructive trust

against the defendant, arising from the facts that the explorations to determine the value of the property were made by defendant, as manager of the Cheshire mine, and at the expense of that property when it was owned by all the parties jointly, and when defendant was managing it in the interest of all, and under obligation to give to all the benefit of his knowledge and of such acquirements as he should make at the common expense.

Any understanding, preceding or contemporaneous with the North Cheshire property lease, that defendant should procure such a lease and hold it for the benefit of all the heirs, we do not find made out. We do not think that if immediately after its acquisition he had insisted with the others that he had taken the lease in the common interest of all, and if he had undertaken to charge them with its obligations, he would have been able to establish against them a duty of any sort, supported by anything done or said by themselves, to participate in the chances which would attend the taking of the lease, and the experiment of opening mines on the leased lands. He must, as we believe, have failed in showing that they had consented to take any such chances or to participate in any such experiment. We therefore put out of view all questions of the legal validity of any such understanding, contenting ourselves with saying we do not find it proved.

Neither do we find that independent of express agreement a case of constructive trust is made out. Such a case must rest upon fraud either actually intended or resulting from a failure to recognize and observe the rules of business integrity. A charge of the kind, especially when made against a near relative who up to the time of making it had been implicitly confided in, ought not to be lightly made or accepted. All presumptions must be against it. *Campau v. Lafferty* 50 Mich, 114, 117. The accused party in common fairness is entitled to a favorable construction of any conduct reasonably consistent with integrity ; and the accusation which might seriously affect his business reputation for life, should not be held proved on facts and circumstances which

are merely ambiguous, and may therefore, if fully under-stood, be consistent with honesty.

In this case there are some circumstances which standing by themselves without explanation look unfavorable to the defendant. He did undoubtedly prospect on the North Cheshire property and acquire a lease of it while managing the Cheshire mine; he expended money on the leased land during that period; he mingled the accounts of expenses with the accounts of the Cheshire mine. But when all the facts appear, the case is relieved of its unpleasant features.

In the first place, on the facts as they appear when all dis-closed, the defendant, though manager for all the parties to some extent, was not and had not been in the position of owing to the other heirs the duty to give to the common business all his time. He had some portion of his father's estate in charge; others of the heirs had other interests in charge in the same way; but we find nothing in the case resembling the employment of agents whose entire time and abilities are paid for while the employment continues. On the contrary we think these parties were fully at liberty to engage in independent employments and ventures of their own, as they undoubtedly all of them did. There was nothing therefore in the mere fact that defendant when pros-pecting and when acquiring a lease of adjoining lands was manager of the Cheshire mine that could preclude his taking the lease in his own interest.

But in the second place we think the defendant has estab-lished the fact that after April, 1880, he understood, and had a right to understand, that the Cheshire mine was appor-tioned and set-off by agreement from the common property to him; and that this understanding fully accounts for and excuses his mingling the North Cheshire accounts with those of the Cheshire mine, until the following December, at which time his brother Frank insisted upon and was accorded an interest in the Cheshire mine, when a separation of accounts became necessary and was made. When thus explained we see that the fact that the accounts were mingled while defendant was thus understood to be owner of

the Cheshire mine is not by itself even a suspicious circumstance; much less a circumstance proving fraud.

But complainants insist that the understanding whereby defendant was to take the Cheshire mine at a valuation of $10,000 was assented to on their part in consequence of false and deceptive statements made by defendant for the purpose of procuring that property to himself for a very small fraction of its value; that when they discovered the facts they insisted on sharing equally in the mine, and have done so, and that defendant cannot therefore be permitted to retain advantages acquired by him while the understanding which was arrived at only in consequence of his fraud, continued.

But if it be true, as complainants charge, that defendant fraudulently undertook to acquire the Cheshire mine for less than its value, we do not see that the fact aids the complainants in this suit. That fraud was apparently redressed when defendant consented that the Cheshire mine should be held in common by all; and the attempt to perpetrate it cannot by itself work a forfeiture of rights by defendant. If he had before the final adjustment acquired independent interests, he had a right to retain them; and the complainants, in order to establish any rights for themselves in respect to such interests would be under the necessity of laying a basis therefor in contract. But as we have already said, no contract that defendant should obtain a lease of the North Cheshire property in the interest of all is made out; and we do not think there was even an understanding to that effect. The defendant made a venture there which proved to be successful, and which for that reason complainants are now desirous to share in; but it was, perhaps quite as likely at the outset to prove unsuccessful as thousands of mining ventures in the same region have done heretofore. The mere fact of contiguity to the mining lands owned by the parties in common neither made out against complainants an obligation to participate in the risks, nor against defendant an impediment to taking the venture upon his own hands. Each party was at liberty to act independently of the other in the matter except as by contract they might agree to joint expen-

ditures and joint risks, which in this case we do not find they ever did.

Our conclusion is that this bill so far as it claims rights for complainants in the North Cheshire or Swanzey mine, must fail. Complainants are entitled to a severance of interests in the Cheshire mine, and may take decree for an accounting and a sale for the purposes of a partition if they desire. But we do not think there is any case for a receiver. No allegation of insolvency is made against defendant, and complainants have been satisfied heretofore to leave their interests in his hands. But pending further proceedings, if complainants elect to take them and defendant objects to a receiver, he should not be allowed to charge for his own services.

Defendant is entitled to costs of this Court, but the costs in the circuit court will be left to the discretion of that court, to which the record will now be remitted.

SHERWOOD and CHAMPLIN, JJ. concurred.

CAMPBELL, J. The object of this suit is to reach a leasehold interest in mining property which stands in defendant's name, but which he is alleged to hold for the common benefit of himself and complainants as partners.

The case contains a great deal of testimony which is chiefly valuable as showing the relations of all the parties arising out of their father's intestacy. Much of it does not go very far towards settling this controversy, which arises out of a transaction detached for most purposes from all the rest. As connected with a final division of the paternal estate, it has some force.

Complainants and defendant are brothers and constitute all the heirs of James Pierce, deceased, who resided in Pennsylvania and died intestate in December, 1874, leaving a widow still surviving. Among his other possessions was an interest in, and a debt against an iron mine then known as the S. C. Smith Iron Mine, having some collateral and appurtenant interests besides the mining land in Marquette county. Complainant Walter Pierce and defendant were appointed administrators in Pennsylvania, but not appointed

in Michigan. The several sons were employed more or less in the management of different classes of property in Pennsylvania and elsewhere for the general account, and in 1877 this mine was put in operation again under the direction of the estate, defendant being manager, with the consent of the widow and heirs. In 1879 the title was purchased for the estate at bankruptcy sale, and was thereafter carried on by the consent of all the parties under the nominal charge of the administrators, and under defendant's special supervision until the distribution hereafter mentioned.

In April, 1881, after a series of propositions and figurings, a division was got at which was intended to parcel out the estate between the widow and heirs, and most of the property outside of this mine was set apart in separate ownership to the widow and heirs. This Smith iron mine, which had become known as the Cheshire iron mine, was at first in these negotiations set down to defendant, and subsequently to him and another jointly. Finally on a discovery or an alleged discovery that it was more valuable than it had been set down in the estimate, it was concluded that it should be owned by all the sons equally and worked for their benefit as partners under defendant's supervision. This distribution was completed April 1, 1881, to be retrospective so far as the use and benefit of the various parcels were concerned, so as to give each the profits of such use from the same time in the previous year.

On the 31st day of December, 1880, in pursuance of previous negotiations, defendant took in his own name the option of a lease of an adjoining parcel of mining land, lying north of the mine thus held in common and subsequently called the North Cheshire. He got a lease in due form on the 15th of April, 1882. Complainants claim that this acquisition belongs to the partnership. Defendant claims it as his own.

Some preliminary questions were suggested concerning the title of the principal property and the necessity of making the widow a party. It does not seem to us that any important principle is involved here. It cannot be claimed that, as Pennsylvania administrators or as administrators at all, the

two parties thus designated could have carried on this Michigan mine. They derived their power entirely from the personal consent of the widow and heirs, who were all of age. By mutual consent the widow relinquished all interest in this property and it became the property of the sons, who became partners, but who took the property just as it had stood previously, and were entitled to hold it with all its appurtenances, as they and the widow would have done if no change had been made. It is not claimed by defendant that any other rule was intended. The only contention is whether this North Cheshire property was included.

It is claimed and shown that when the article of distribution was executed defendant asserted his claim to separate ownership of this. But it is also clear that this was there denied. If it had theretofore been a partnership interest, inasmuch as all these heirs took an equal share in the old mine and kept it in common, this assertion could not change the facts. There was we think nothing at that time which could amount to an acquiescence And in the paper then executed there was no such designation of the Cheshire mining property as would exclude it if really owned together.

Upon this fact there is a direct conflict of testimony. It appears that the original exploration and the working up to the time of the distribution had been with the funds and appliances of the Cheshire Company, although defendant claims he meant and ordered the keeping of the accounts and application of expenses to be kept separate. The actual separation on the books seems to have been made somewhat later, and the accounts for money expended remained open for some time. The houses erected by the Cheshire Company were used for the North Cheshire miners, but defendant claims this was to be made good by rent. There was also some mingling of products which both parties claim as operating differently from each other's theories. It is also shown that the joint properties would be of considerable service to each other if held together.

In the conflict of testimony as to what was actually intended I am satisfied from a comparison of the whole case

that the acquisition of the North Cheshire was first thought of in connection with the other mine, and that it. was understood among the brothers and by the widow that this was in contemplation. If so, then the use of the Cheshire facilities and money to obtain and develop it, was the natural result. The whole course of business, including these expenditures and the manner of their first entry on the books, all have some bearing in confirmation of complainants' testimony.

The case being one of fact entirely, and the decision below according with what seems the practical understanding and conduct of the parties before the full value of the speculation became known, I think it should be affirmed.