COPPER RIVER MINING CO. v. McCLELLAN et al.

(Third Division. Valdez. November 28, 1903.)

No. 1.

1. TRUSTS—CONSTRUCTIVE TRUST—BREACH OF AGENCY CONTRACT—LOCATION OF MINES.

    If an agent locates mines for himself which he ought to locate for his principal, *held* trustee for principal.

    [Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, § 152.]

2. SAME—EVIDENCE—BURDEN OF PROOF.

    The burden of proof is upon one who seeks to establish a trust in a mining claim against both the record and the quiet

possession of the locator. A court of equity will not adjudge the locator of a mining claim, who is in peaceable possession under a clear record title, to be a trustee of that title and possession for another, upon an alleged prior oral contract to locate it for the other, unless the case is established by full, clear, and satisfactory evidence.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, §§ 157, 128.]

3. SAME—SUFFICIENCY.

Plaintiffs brought this suit to establish a trust in real estate, based upon alleged oral admissions and declarations. *Held*, that such oral admissions ought to be viewed with caution; that such trust would not be recognized and enforced without its nature and extent are made out by clear and unambiguous proofs.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, § 160.]

This is a suit in equity, the bill concluding with a prayer for a decree adjudging: (1) That the locators of that certain group of copper mines particularly described therein, and commonly known as the "Bonanza Group," were at the time they located the said mines acting as the agents, servants, and employés of the plaintiff; (2) that plaintiff is the owner of said mines; (3) that the defendants hold the legal possession and title with prior notice of plaintiff's equities, and as trustee for the plaintiff; and (4) that defendants be required to convey such possession and title to the plaintiff.

The answering defendants, except Millard, deny all the facts upon which plaintiff predicates its prayer for relief, and the defendants comprising the McClellan party claim to own the entire property in the Bonanza group, subject only to the rights of the Alaska Copper Company, to whom most of them have made optional contracts of sale. Defendant Millard claims to be the owner of an undivided one-half of R. F. McClellan's interest in the Bonanza mines by virtue of a prospecting contract between them.

While there is a wide divergence between the evidence of plaintiff and defendants on some important details in this case, upon the general narrative there is but little or none. The court finds the following statement to be either admitted by the evidence upon both sides, or so little in dispute that it is accepted by the court as the underlying basis of truth in the case.

· In 1898 a party of seven or eight men was organized in Princeton, Minn., to prospect for minerals in Alaska. Their leader, after whom the party, with its changing membership, has since been called, was the first-named defendant in this case, R. F. McClellan. They prospected in 1898 along the tributaries of the Copper river, and returned home in the fall without locating any of the property in controversy in this action. In the spring of 1899 the party was reorganized under the same leader, some of the former members dropping out and new ones taking their places, when they entered upon another season's work along the same river. The McClellan party during the season of 1899 consisted of but five prospectors, viz., R. F. McClellan, E. A. Gates, H. T. Gates, H. H. Fitch, and Clarence L. Warner. About the latter part of August, 1899, E. A. Gates, James McCarthy, and Arthur H. McNeer discovered and located the Nicolai group of copper mines on the right limit of the Nizina, a branch of the Chitina Fork of the Copper river, and about 180 miles east of Valdez, Alaska. In making these locations Gates acted for the McClellan prospecting party, and McCarthy and McNeer · for other parties then prospecting in that neighborhood. Each of the five members of the McClellan party acquired an equal undivided interest in that part of the Nicolai mines secured by Gates' locations by reason of his membership in the said prospecting partnership.

After the prospecting season of 1899 was ended, and about October 1, 1899, the McClellan party met in Valdez, settled their affairs for the past season, enlarged their party by adding

thereto D. S. Kain, John L. Sweeney, J. H. Smith, J. E. Hamlin, and W. S. Amy.   Capt. W. R. Abercrombie seems to have been a member at this time, and possibly became such before the season of 1899 began.   At the Valdez meeting or meetings it was agreed that some of the members of the party should go to the States for the winter, while others were to stay and prospect on Prince William Sound during the winter, and return to the neighborhood of the Nicolai group to prospect early in the spring.   All those interested in the Nicolai copper locations except Warner left Valdez in October for the States. They were McClellan, E. A. Gates, H. T. Gates, and H. H.. Fitch.   The steamer which carried them out towed a smaller boat loaded with supplies, and with Kain, Sweeney, Warner, and Smith aboard, from Valdez to a point on Prince William Sound, where they were dropped, and where they prospected until some time in December.

Negotiations had been begun in the fall of 1899 by which it was sought to consolidate the interests of the separate parties interested in the Nicolai group.   R. F. McClellan represented the McClellan prospecting party, B. F. Millard represented the Chippewa Falls party, H. G. Allis an Arkansas company, and George M. Perine a fourth interest.   After McClellan had returned to his home at Princeton, Minn., he went to San Francisco, to meet these interests in the matter of the proposed consideration.   It was then finally agreed between these parties to convey all their separate interests in the Nicolai group and other neighboring property to the Chittyna Exploration Company, a California corporation, and accept stock in the receiving company for them.   At a regular meeting of the stockholders of the Chittyna company at San Francisco on January 9, 1900, a resolution was adopted authorizing the purchase of both the Millard and McClellan party interests, and at a directors' meeting of that corporation, held on March 23, 1900, a deed from McClellan and wife, conveying most of the

McClellan party interests, was presented and accepted, and 150 shares of the capital stock of the company were issued in exchange; the stock being issued, by order of McClellan, in the following names and amounts: To H. H. Fitch, 25 shares; to C. L. Warner, 25 shares; to H. T. Gates, 12½ shares; to E. A. Gates, 12½ shares; to Grace G. McClellan, 47 shares; to R. F. McClellan, 3 shares; to R. C. Dunn, 12½ shares; to S. G. Iverson, 12½ shares. The Gates brothers had been grubstaked by Dunn and Iverson, which explains their division of stock with them. No explanation is offered why McClellan had 50 shares assigned to him; but, as no dissatisfaction has arisen with his prospecting partners about this division, it may be considered as a private arrangement in the interest of that party, and immaterial in this case.

While in San Francisco on these negotiations, McClellan was asked by Perine and Millard to undertake the superintendency of the Chittyna company's affairs in Alaska for 1900, but before he consented to do so he desired to consult with some of his former prospecting partners in Princeton, Minn. Upon his return to his home at Princeton, he obtained the consent of E. A. Gates and H. H. Fitch, and employed them to assist him, and then by letter of January 9, 1900, notified George M. Perine of his acceptance of the position. Perine reported that he had made an arrangement with McClellan to the directors of the Chittyna Exploration Company, and at their next meeting on March 23, 1900, Perine's report was ratified by that body. From the testimony of Millard and Perine it appears that the details of the arrangement with McClellan were proposed in a conversation or conversations when they three were alone and no one else was present. The controversy in this case arises almost entirely over what that agreement was.

McClellan employed nine men at Princeton for the Chittyna Company's work in Alaska, including H. H. Fitch and E. A.

Gates—Fitch as head packer, and Gates for his knowledge of the location of the Nicolai group, which he had located with McCarthy and McNeer. He employed several other men at Seattle, and left that port early in April, 1900, with an outfit, provisions, and 12 horses, all purchased and furnished by the Chittyna Exploration Company, with which he landed at Valdez on the 17th day of April, 1900. It is admitted by both sides that his destination was the Nicolai group of copper mines, upon which he was to do both assessment and development work.

Sweeney, Kain, Smith, and Warner, four members of the McClellan prospecting party (all but Warner having joined in the fall of 1899), prospected along Prince William Sound until December, when they returned to Valdez. They remained here until March 2, 1900, when they started for the Chitina country, pulling hand sleds. They were not then informed of the arrangement by which McClellan was coming in with the Chittyna company's outfit, nor of any sale of their provisions or horses; the latter being left behind, however, for the use of the outside members when they should arrive. Sweeney, Kain, Smith, and Warner stopped at the Amy cache at Ptarmigan drop, which the McClellan prospecting party had acquired the fall before, when W. S. Amy became a member of the party, and took supplies from it for their trip into the interior. They pulled their sleds and supplies across the mountains and rivers to the vicinity of the Chitina river, and camped beside the McCarthy cabin, from which point they prospected around the Kuskalana river until the latter part of June.

McClellan, with the Chittyna Company's party, left Valdez for the Nicolai mines on April 20th, following the same route which Sweeney, Kain, Smith, and Warner had taken nearly seven weeks previously. McClellan took the horses belonging to the McClellan prospecting party, and used them in packing for the Chittyna Company. Hindered by heavy loads and

horses and retarded by the snow, the Chittyna party under Mc-
Clellan did not reach the Amy cache at the Ptarmigan drop
until May 20th.    This place was their headquarters until June
4th.    They arrived at the Tonsina crossing on the 9th, and
the Copper river crossing at the mouth of the Tonsina on the
15th of June, at which place they were met by Smith and
Sweeney, coming out looking for the expected spring arrival
·of the remainder of the McClellan prospecting party with the
horses, supplies, and the mail.

Sweeney remained two nights and a day with the party at
the Copper river, and then went on up the Tonsina to the cross-
ing, where he met .Ray, Millard, and Dickey, with whom he
made a summer's cruise for the McClellan prospecting party to
the Tanana.    Smith returned to his camp at McCarthy's cabin,
where he had left Warner and Kain.    Two of the Chittyna
Company's employés (Kernan and Williams) returned to the
McCarthy cabin with Smith, who, at the request of McClellan,
pointed out some of the mines near there belonging to the
Chittyna Company, and directed them where to do assessment
work thereon.

By the latter part of June, McClellan had moved the Chittyna
·outfit to the McCarthy cabin, where and when he employed
D. S. Kain, another member of the McClellan prospecting
party, to take charge of the actual development work on the
Nicolai 'mines for the Chittyna Exploration Company.    The
Chittyna party, under McClellan, reached the Nicolai mines at
midnight on July 6, 1900, and immediately thereafter began
assessment and development work thereon.    They continued
at the Nicolai mines from that time until September 1st, en-
gaged in doing the assessment and development work; they
made no locations of other mines or water rights of any kind.
On July 25, 1900, George M. Perine, with Clinton L. Walker
and his brother, Archie Walker, accompanied by Sam East-
man as cook, arrived at the Nicolai mines to inspect the same

on behalf of the Chittyna Exploration Company.   While there McClellan informed Perine that Warner and Smith had discovered the Bonanza mines, showed him a sample of the ore, sent for Warner to come to the Nicolai camp, from which he conducted McClellan, Perine, and the Walkers to the Bonanza locations.   McClellan informed Perine that they were not taken up for Chittyna Company, but in the individual names of the locators.   Perine and the Walkers remained there an hour, and returned to Valdez immediately after, and thence to San Francisco.   The Bonanza group is situated 18 or 20 miles by traveled route from the Nicolai group and camp.

The Bonanza group of copper mines, in controversy in this action, was discovered, marked, and located, and every act necessary to a full, valid, and legal mining location thereof was made and done, by John H. Smith and Clarence L. Warner, without the physical aid of any other person whatever, at the dates hereinbelow stated, to wit:

| Name of Mine | Date of Location | Names of Locators on Notice |
|---|---|---|
| "Liberty" | July 4, 1900 | Warner, Smith, Kain, Gates |
| "Bonanza" | " 22, " | "      "   .   "      " |
| "National" | " 22, " | "      "      "      " |
| "Excelsior" | " 22, " | "      "      "      " |
| "Mammoth" | · " 22, " | "      "      "      " |
| "Jumbo No. 1" | " 26, " | "      "      "      " |
| "Jumbo No. 2" | " 26, " | "      "      "      " |
| "Amazon" | Aug. 3, " | "      "      " |
| "Atlantic" | " 24, " | "      "      " |
| "Pacific" | " 24, " | "      "      " |
| "Independence No. 1" | " 26, " | "   McClellan,  Gates |
| "Independence No. 2" | " 26, " | "      "      " Smith |

There is no evidence that the Chittyna Exploration Company made any direct contract of agency or employment with Smith, Warner, Kain, Gates, or Fitch.   If either of them, or any other member of the McClellan prospecting party, except McClellan himself, was an agent, servant, or employé of the

Chittyna Exploration Company at the time of the location of these mines, it was by virtue of some oral contract or agreement entered into between them, or either of them, and R. F. McClellan, acting as the superintendent of the company in Alaska. There is no evidence that any other member of the McClellan prospecting party than those last above named had any agency or employment for or on behalf of the Chittyna Exploration Company for the year 1900.

This suit was begun against defendants by the Chittyna Exploration Company on August 11, 1902.

. W. B. Heyburn, E. L. Campbell, V. T. Hoggatt, Andrew F. Burleigh, Francis W. Cushman, O. P. Hubbard, N. V. Harlan, John Y. Ostrander, Charles H. Aldrich, for plaintiff.

Frank D. Arthur, Fred M. Brown, J. A. Carson, S. T. Gorham, and W. H. Gorham, for defendants except B. F. Millard and Abercrombie.

Leedy & Kelsey, for defendant B. F. Millard.

John Lyons, for defendant Abercrombie.

WICKERSHAM, District Judge (after stating the foregoing admitted facts in narrative form). This suit is brought upon the theory that the defendants who located the Bonanza group of copper mines were at that time the agents of the plaintiff, and that their locations became, were, and now are, the property of the plaintiff. Some testimony is offered by the plaintiff to prove that defendants locating used food supplies and horses belonging to the plaintiff in making the discoveries and locations, but this evidence is offered as additional proof of the direct contract of agency, and it is not sought thereby to establish a mere grubstake interest with the defendants in the property by implication. In his argument before the court the leading counsel for the plaintiff declared that the controversy was "a simple question of contract," and the pleadings

and evidence come to that point. The position of the plaintiff is this:

"The locators were our agents, employed, supported, and paid by us, under a specific contract to locate mines in this particular neighborhood for us. They did locate these mines for us under that agreement. We paid them, and they have no interest in the property, but hold it as mere naked trustees for us."

The defendants deny the contract of agency, and allege that the mines were located for the McClellan prospecting party by Warner and Smith under their prior contract with the members thereof.

Mining claims on public lands are "property" in the fullest sense of the word, which may be sold, transferred, mortgaged, and inherited without infringing the title of the United States. Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313. A mining claim perfected under the law is "property" in the highest sense of that term, which may be bought, sold, and conveyed, and will pass by descent. Belk v. Meagher, 104 U. S. 279, 26 L. Ed. 735. The character of the title acquired by the defendants in the Bonanza group upon the locations made by Warner and Smith is even more particularly described in another case, where the Supreme Court says:

"They were the discoverers of the claim. They marked its boundaries by stakes, so that they could be readily traced. They posted the required notice, which was duly recorded in compliance with the regulations of the district. They had thus done all that was necessary under the law for the acquisition of an exclusive right to the possession and enjoyment of the ground. The claim was thenceforth their property. They needed only a patent of the United States to render their title perfect, and that they could obtain at any time upon proof of what they had done in locating the claim, and of subsequent expenditures to a specified amount in developing it. Until the patent issued, the government held the title in trust for the locators or their vendees." Noyes v. Mantle, 127 U. S. 348, 8 Sup. Ct. 1132, 32 L. Ed. 168.

It is upon this class of real property that plaintiff seeks to fasten a trust arising out of an oral contract of agency.

If an agent locates land for himself which he ought to locate for his principal, he is in equity a trustee for his principal. Massie v. Watts, 6 Cranch, 148, 3 L. Ed. 181; affirmed in Kerr v. Watts, 6 Wheat. 550, 5 L. Ed. 328; Irvine v. Marshall, 61 U. S. 558, 15 L. Ed. 994; Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. Ed. 719; Lakin v. Sierra Buttes Min. Co. (C. C.) 25 Fed. 337; Hunt v. Patchin (C. C.) 35 Fed. 816; Book v. Justice Min. Co. (C. C.) 58 Fed. 106; Moore v. Moore, 121 Fed. 737, 58 C. C. A. 19; Lockhart v. Rollins (Idaho) 21 Pac. 413. In the case of Book v. Justice the court (Hawley, Judge) said:

"An oral agreement to locate a mining claim for the benefit of another need not be in writing. If a party in pursuance of such an understanding, at the expense of another, locates the claim in his own name, he holds the legal title to the ground in trust for the benefit of the party for whom the location was made; and such party could, upon making the necessary proofs, compel the locator of the mining claim to convey the title thereof to him, although the agreement so to do was not in writing. This familiar principle has been often applied in cases where a party has entered into an oral agreement to locate mining ground for the joint benefit of himself and others, and makes a location in his own name. It has always been held that such oral agreements are not within the statute of frauds. Gore v. McBrayer, 18 Cal. 582; Moritz v. Lavelle, 77 Cal. 10, 18 Pac. 803, 11 Am. St. Rep. 229; Hirbour v. Reeding, 3 Mont. 15; Welland v. Huber, 8 Nev. 203."

The burden of proof is upon one who seeks to establish a trust in a mining claim against both the record and the quiet possession of the locator. The court will refuse to move until the trust is clearly established in favor of the party alleging it. To establish the existence of a trust, the onus probandi lies on the party who alleges it. Prevost v. Gratz, 6 Wheat. 482, 5 L. Ed. 311; Dalton v. Dalton, 14 Nev. 419.

The Bonanza group was located by the defendants in July and August, 1900. This suit was begun August 11, 1902. The defendants remained in quiet and peaceable possession of the property for two years, under a clear, unclouded, complete,

and unchallenged record title.  Plaintiff now seeks by this action to have that title and possession taken from the defendants by a decree of this court and transferred to it.  Such a decree is an exercise of the highest civil jurisdiction of a court; it is the extreme limit of its power over property, and ought not to be entered in doubtful cases.

The bottom rule in such cases was so clearly stated in an early case in the English chancery courts that it has since been quoted and followed by the American courts:

"In the great case of Cook v. Fountain, 2 Swanston, 591, it is well said that 'there is one good, general, and infallible rule that goes to both of these kinds of trusts—express and implied.'  It is such a general rule as never deceives; a general rule to which there is no exception, and that is this:  The law never implies, the court never presumes, a trust, but in case of absolute necessity.  The reason of this rule is sacred, for if the chancery do once take the liberty to construe a trust by implication of law, or to presume a trust unnecessarily, a way is open to the lord chancellor to construe or presume any man in England out of his estate; and so at last every case in court will become casus pro amico."  Dalton v. Dalton, 14 Nev. 419.

Nor will a court of equity adjudge the locator of a mining claim, who is in peaceable possession under a clear record title, to be a trustee of that title and possession for another, upon an alleged prior oral contract to locate it for the other, unless the case is established by full, clear, and satisfactory evidence. Hopkins v. Grimshaw, 165 U. S. 342, 17 Sup. Ct. 401, 41 L. Ed. 739, citing with approval Prevost v. Gratz, 19 U. S. 481, 5 L. Ed. 311; Slocum v. Marshall, 2 Wash. C. C. 397, Fed. Cas. No. 12,953; Smith v. Burnham, 3 Sumn. 435, Fed. Cas. No. 13,019.  In Slocum v. Marshall, supra, Associate Justice Washington, of the Supreme Court of the United States, wrote the opinion, and upon the point above stated he says:

"It is sufficient to say, in answer to the first question, that there is no evidence of a declaration of trust, either written or parol, by which the nature of that trust can at all be understood, and the attempt to create and to enforce a specific trust from the loose and equivocal

2 A.R.—10

expressions of the parties, made at different times and upon different occasions, would be inconsistent, not only with the spirit and policy of the statute of frauds, but with the general rules of evidence. In this case, it is true, the statute of frauds is not pleaded or relied upon; but it is still necessary that the parol declarations of a trust should be plain and unambiguous, before the court can change the absolute nature of the conveyance, and decree an execution of a trust not expressed in the deed."

In support of the general rule the following additional authorities are cited: Perry on Trusts (3d Ed.) vol. 1, §§ 86, 137; Millard v. Hathaway, 27 Cal. 120; Anthony v. Chapman 65 Cal. 73, 2 Pac. 889; Dalton v. Dalton, 14 Nev. 419.

It is not every location of a mine by an employé or agent which will be held to be in trust for the employer or principal. The statute declares the valuable mineral lands of the United States to be free and open to exploration and purchase by all citizens of the United States. The right of an employé of a mining company to explore and locate mining claims on the public domain in his own name and interest is equally as valid as that of his employer. The mere fact of his employment in the employer's mine to do either assessment or development work, or labor in extracting its mineral wealth, will not of itself, restrict his independent right to locate other claims. He is not limited either as to place or quantity by such employment; he may locate adjoining claims, however valuable they may seem to the employer. Many of the richest claims and mining camps in the west have been located by miners who worked for other claim owners for a sufficient grubstake to enable them to prospect for themselves another part of the year, and rich claims are frequently located while the locators are engaged for hire upon adjacent claims. Nor have such facts by themselves ever been held by the courts to create the relation of trustee and cestui que trust between the locator and his employer in relation to such locations. As long as the employé does not assume such a position of trust or confidence toward his employer, or such a fiduciary rela-

tion as to make it inequitable for him to do so, he may locate mines when and where he pleases on the unoccupied and unappropriated public domain.

Nor is it every position of trust and confidence, nor every fiduciary relation, which bars the trustee from independent action in locating mining claims. However close the relationship may be, however much the employer or principal may depend upon the honesty, integrity, and fiduciary relationship existing between himself and his employé or agent, if these relations are limited by their acts or contract to certain bounds, and these do not forbid the location of mines by the agent or employé for his own use—do not make such location inequitable, or in fraud of his employer's òr principal's interests— he will not be declared to be a trustee for his employer or principal. In the case of Pierce v. Pierce, 55 Mich. 629, 22 N. W. 81, the manager of a mine acquired the lease of and developed an adjoining mine. Upon a suit to enforce a trust therein for his employers the Supreme Court of Michigan, by Cooley, C. J., held that the fact that he was such manager did not, of itself, create the relation of trustee and cestui que trust between them in relation to the newly acquired mine, and said:

"Such a case must rest upon fraud, either actually intended or resulting from a failure to recognize and observe the rules of business integrity."

The plaintiff has not failed to recognize the correct rule in its bill. It alleges that the locators of the mines in controversy were at the time its agents, and were employed, supported, and paid to locate these claims for it, and did discover and locate them under contract with it, and while so employed, supported, and paid by it. These allegations are as certainly denied by the defendants, and the question of agency thus stands at the threshold of the case. Were the locators of the Bonanza mines at the time of the discovery and location agents of, under contract with, paid and supported by, and acting in the interests

of, the plaintiff; or were they then standing in any such fiduciary relation toward the plaintiff that it would be inequitable to permit them to retain the title to the said property; or did they locate the mines through information obtained from the principal, or from their near relationship to its business or its agents, and thereby deprive the principal of its right to locate them; or was their location inequitable, and in fraud of the plaintiff's rights?

The first real struggle in this case begins over the extent of the agency assumed by R. F. McClellan as superintendent of the plaintiff company in Alaska in 1900. That he acted as such superintendent in doing assessment work on their scattered mines and development work on the Nicolai group for patent is admitted. The plaintiff seeks to extend his agency to include the location of the Bonanza group, while the defendants deny that it can have such bounds. Perine and Millard testify that they made the agreement with McClellan by parol, and Cordrey, the secretary of the board of directors of the plaintiff company, testifies that McClellan was present on March 23, 1900, when that contract was stated to the board by the president, and ratified by that body for the company. The contract so stated and ratified, is in the following words:

"The president then stated that Mr. R. F. McClellan had been engaged to act as superintendent for this company in Alaska for the year 1900, to attend to such assessment work as is required by law, to obtain U. S. patents to the several mines owned by the company, and to locate and have located all other mines and water rights in that vicinity for the company, and hire men for those purposes and all other work of development and location as is necessary, and that he had agreed to pay Mr. McClellan for his services $125 per month for the year 1900. On motion of Director J. P. Fraser, seconded by Director Grant Cordrey, the action of the president in employing Mr. McClellan to act as superintendent of this company at a salary of $125 per month for the year 1900 be approved, and, on motion being put, it was unanimously carried." See page 337, vol. 2, "Depositions."

This statement must be accepted as the contract from the standpoint of the plaintiff. Either it is such, or they have none, for no other is shown by the evidence to have been made by the contracting power in the corporation, nor stated to nor ratified by it. It does not appear that Perine and Millard, or either of them, or any other person, had authority to or did make any other contract for the company or by its authority, or that any additions, qualifications, or exceptions were made to this one by the board of directors, or by its authority, or that it ratified the same. The statement so made by the president of the board of directors of plaintiff company, and ratified by it on March 23, 1900, must stand alone as the plaintiff's statement of that contract.

On the other hand, McClellan denies that he agreed generally to locate mines for the company, and says that to that extent the contract as ratified by the company was and is incorrect. Defendants take the position that McClellan's contract was limited by his letter of acceptance written to Perine under date of January 9, 1900, from Princeton, Minn., and placed before the board of directors in San Francisco on January 15th. See Plaintiff's Exhibit No. 5, p. 454, vol. 2, "Depositions." This may have been the condition of their negotiations on that date, but if he was present before the board of directors on March 23d, and agreed to the contract stated and ratified then, his and all other former negotiations, by letter or otherwise, were merged therein, and both parties were bound thereby.

In the view that I take of the evidence in this case, however, it can make no difference whether he agreed to the locating clause in the stated contract or not. Conceding that the contract was as stated by the president and ratified by the board, in what respect was it violated by McClellan? Let us examine it for a moment, and consider what his agreement was according to its terms. In construing it, it may be divided

into four clauses. The president stated: "First. That Mr. R. F. McClellan had been engaged to act as superintendent for this company in Alaska for the year 1900." That is admitted by all parties. "Second. To attend to such assessment work as is required by law to obtain U. S. patents to the several mines owned by the company." That is admitted also, but with a qualification, for the evidence is undisputed that the development work therein mentioned was to be and actually was done with the subsequent approval of the plaintiff upon the Nicolai group alone. "Third. And to locate and have located all other mines and water rights in that vicinity for the company." What vicinity? Clearly, from the context and from the evidence in the case, it referred to the vicinity of the mines upon which the development work for patent was to be done; i. e. the Nicolai group. "Fourth. And hire men for those purposes and all other work of development and location as is necessary." The last clause gave him authority to hire such men as were necessary to do the locating, assessment, and development work agreed upon. This was the extent of his agency, his power and duty, as contained in plaintiff's statement of the contract.

Does the evidence show that McClellan acted within the line of the duty agreed upon by that contract, or inequitably, unjustly, or in fraud of plaintiff's rights? The act complained of was the location of the Bonanza group of copper mines by Warner and Smith. Was it McClellan's duty under that contract to disband the McClellan prospecting party, and prevent Warner and Smith from locating any mines in Alaska that year? The contract does not require him to do so, and his prior obligations to these prospectors forbade it so far as their interests were involved. Was it his duty under that contract to prospect generally amid the fastnesses of the Alaskan Alps, or along the numerous tributaries of the Copper river, in search for unknown mines, or was his principal duty to do

the assessment work on already acquired mines, and the development work for patent on the Nicolai group, and to locate such mines and water rights in that vicinity as were necessary to protect, extend, and complete that valuable enterprise? There can be no serious question on this point. The Nicolai group was a known and valuable group of copper deposits. McClellan was sent north to do the necessary assessment work on the undeveloped mines to comply with the law, but particularly to do development work on this group for patent. This was his principal duty, and the making of additional locations was secondary. In the work of developing the valuable veins of the Nicolai mines, it would be his duty under the contract, and as a wide-awake and faithful superintendent, to locate or have located any extensions of the ore bodies which the work uncovered, and such water rights adjacent thereto as were thought necessary to work them, to the end that his principal's property might be more valuable and complete, and not threatened by hostile neighbors. If he had failed to perform that duty, or if he had located, or caused another to locate, extensions of his principal's mines, or the water rights adjacent and necessary to the proper working thereof, or if he had permitted these things to be done by others, and had acquired an interest therein to the damage of the interests under his charge, a different question would be before the court.

But nothing of this kind occurred. The Bonanza group is not within the vicinity of the Nicolai mines. It is shown by the evidence to be 18 or 20 miles distant by the traveled route, and 8 miles, at least, in an air line, according to the plaintiff's first notice of lis pendens filed with the recorder at Valdez. It is over valleys and mountains from the Nicolai group, and is not shown by the evidence to be nearer any other of plaintiff's mines. The water rights thereabout are not shown to be in the vicinity of the Nicolai, or necessary in its develop-

ment or working. In my judgment there was neither a legal nor a moral injury to the plaintiff in the location of the Bonanza mines by Smith and Warner.

So much has been said in this case about the agency of McClellan and his duty to his principal that but little attention has been given to the real facts. The evidence does not show that McClellan located the Bonanza mines, but the contrary. The proof is clear, full, and satisfactory on that point. They were located by Warner and Smith without the previous knowledge of McClellan, and in pursuance to their prospecting contract with the McClellan prospecting party made in Valdez in October, 1899. They had prospected on Prince William Sound from October till December, 1899, when they returned to Valdez. On March 2, 1900, they left Valdez with Sweeney and Kain, afoot, and pulling their sleds, having left the horses belonging to the party at Valdez, to await the expected arrival of McClellan and others. They went to the Amy cache at Ptarmigan drop, sorted the stores there, and took a good supply with them to the interior. They prospected on the Kuskulana until June, making their headquarters at McCarthy's cabin. They first heard of McClellan's superintendency for the plaintiff about June 15th, when he reached the Tonsina, on his way in to the Nicolai. Sweeney left the party there, and went to the Tanana with Ray, Millard, and Dickey. Kain was employed by McClellan as foreman of development work on the Nicolai. Warner and Smith conducted two of the plaintiff's employés to some scattered mines near the Kuskulana, and divided their store of food with them. When McClellan with the plaintiff's party came along later, Warner and Smith traveled with them to the neighborhood of the Nicolai mines, where they left the party, and went off prospecting for the McClellan prospecting party. There is some evidence offered here that plaintiff's food supplies were given to Warner and Smith, and that with these and the

horses of the company they located the Bonanza mines. All the clear and direct evidence upon that point is the other way. Nor is there any evidence worthy of the name to support the claim that they were then in the employ of the plaintiff; the full, clear, and satisfactory evidence is the other way.

Much time was spent in taking testimony recounting disjointed conversations and oral admissions, confessions, or statements against interest alleged to have been made by Warner, Smith, McClellan, and Gates after the location of the Bonanza mines. Perine testifies, for instance, that when he visited the Bonanza prospects soon after their discovery, in company with McClellan, Walker, and the cook, Eastman, McClellan admitted to him that the mines had been located in the names of Warner and Smith, but for the Chittyna Exploration Company, and that he (Perine) desired to have the deeds made to the company at once, and called for his valise, that he might procure the blank deeds for that purpose. Eastman testifies to the same facts, but Walker and McClellan both deny the facts quite as positively. Later, at the Nicolai group, Sexton and Pearson testify to admissions by McClellan which he flatly denies.

It will not be necessary to quote all these oral admissions, or to marshal the evidence to show that they are denied by competent and satisfactory evidence, for there is a good general rule in relation thereto, which forbids the court to give them the weight which counsel for plaintiff think they bear. The Code of Alaska declares that the oral admissions of a party ought to be viewed with caution. Section 673, Code of Civil Procedure. Greenleaf adds to this general rule by declaring that they ought to be viewed "with great caution." This class of evidence, in a case like the one at bar, was considered by Story, Associate Justice of the Supreme Court of the United States, when on circuit, in the case of Smith v. Burnham, 3 Sumn. 435, Fed. Cas. No. 13,019. His opinion is cited with

approval by the Supreme Court of the United States in a similar case—Hopkins v. Grimshaw, supra.   In Smith v. Burnham Judge Story says:

"And then, again, the whole substance of the case is to be made out, as has been already intimated, by confessions. Now evidence of this sort, especially where it goes to the whole merits of the case, is certainly open to much objection. It was well remarked by Sir William Grant in Lench v. Lench, 10 Ves. 518, where an attempt was made to establish by parol declarations and confessions of a party a trust in real estate, that 'it is in all cases most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of the declaration.' "

The case at bar falls within the very evil mentioned by Judge Story.   Here the substance of the whole case is sought to be established by oral admissions positively denied by the defendants.   The original contract of agency is oral, and is disputed in the most important particular, and depends finally upon the oral statement thereof by the president of the board of directors of plaintiff's company, who, it is clearly shown, did not make it, and only stated it as told to him by Millard and Perine.   Then we have an array of other alleged oral admissions testified to by Perine, Eastman, Millard, Sexton, Pearson, Bradshaw, and Helm, and as fully denied by the opposing witnesses.   Then, again, there is a noticeable absence from plaintiff's testimony of documentary proof, which might even serve as the foundation for a trust in real property.   There is not a single writing introduced on the part of plaintiff which can be given this effect, nor is its documentary evidence inconsistent with the strictest business integrity on the part of the defendants.   This phase of plaintiff's case is met by the further criticism of the court in Smith v. Burnham:

"He added, in reference to the case before him, what is equally true in the case before us, that 'there are no corroborating circumstances by any writing under his [the party's] hand. In most of the cases there has been at least something in writing—some account by which it appeared that the fund was laid out.' "

Judge Story continues:

"I have read over the whole evidence in this case, and although there is much from the confessions of the defendant, which, if it stood- alone, might lead one to the conclusion that there was some sort of partnership or joint interest intended by the parties in certain purchases made or to be made of lands and lumber in Maine, yet I am not entirely satisfied that it is so definite and satisfactory, as to its nature or extent or the proportions of the parties, as would lead a court of equity to enforce it; for it is a general rule of such courts not to interfere to direct a specific performance of any agreement where the terms of the contract are not at all definite and full, and its nature and extent are not made out by clear and unambiguous proofs. See Story, Eq. Jur. §§ 751, 764, 767, and the cases there cited. But the countervailing proofs on the part of the defendant do certainly throw great doubts and uncertainties over the proofs on the other side, and lead us to the conclusion that there may have been some mistakes and misapprehensions, to say the least, on the part of the plaintiff's witnesses as to the purport and effect of the conversations of the defendant to which they testify."

The countervailing proofs on the part of the defendants in the case at bar lead fairly to the same conclusion. There are in this record three formal admissions by the plaintiff which are awakening in their nature: First. The report of Mc-Clellan of his superintendency for the plaintiff in Alaska in 1900, and the record of its examination and approval by the board of directors. See Plaintiff's Exhibit 10, p. 464, vol. 2, "Depositions"; also pages 345–352, supra. This report is a full statement of his work on the company's mines, and contains the names and amounts paid and the character of the work done. It shows that no claims were located by him for the company during that season. Second. The admission on the plaintiff's records on January 24, 1902, that plaintiff only claimed an interest with the McClellan prospecting party in ·he Bonanza group, and the admission that the claims were located by that company; also, the lis pendens made and signed by plaintiff's officers to like effect, and recorded February 4, 1902, in the recorder's office at· Valdez. See Plaintiff's Exhibit 13, p. 467, vol. 2, "Depositions," Defendants' Exhibit 56,

p. 267, vol. 3, "Depositions," and page 369, vol. 2, "Depositions." Third. That sworn statement of the plaintiff, made by its officers under the requirements of the laws of Alaska, signed, acknowledged, and sworn to on January 18, 1901, and attested by a majority of its board of directors, and filed in the clerk's office at Juneau on March 14, 1901. This report purports to contain a full statement of its assets. Its mines are mentioned particularly, but none of the Bonanza group, nor any interest therein, is mentioned. See Plaintiff's Exhibit C, p. 13, vol. 3, "Depositions." The failure to mention this property, where it was its duty to do so in marshaling its assets under the law, is strong evidence that plaintiff did not then claim to own the Bonanza group, or any interest therein. Bergere v. United States, 168 U. S. 68, 18 Sup. Ct. 1, 42 L. Ed. 383. The failure of the plaintiff to do assessment work upon the Bonanza mines in 1901 is another admission in the same line. The numerous letters written in November and December, 1901, a year and a half after Perine and Millard had full knowledge of the facts concerning the location of the Bonanza group, in which they sought to act as agents for the sale of the mines to their concealed principal, and in which they fully admit the ownership of defendants, cannot fail to throw doubt and uncertainty upon their later testimony as witnesses in the case, and, in the words of Judge Story, "lead us to the conclusion that there may have been some mistakes and misapprehensions, to say the least, as to the purport and effect of the conversations of the defendant to which they testify."

The evidence in the case shows clearly that defendant Fitch was employed as head packer for plaintiff's party under McClellan, that Kain was employed as foreman of the development work on the Nicolai mine, and Gates as a laborer thereon. They were so employed when the mines in suit were located, and paid therefor. Their accounts were stated in McClellan's

report, and their payment approved by the plaintiff by a formal act of its board of directors. There is no testimony in the case to show that either Fitch, Kain, or Gates had any other relation toward the plaintiff than mere employés to perform a specified kind of labor, which they did perform satisfactorily, so far as the record goes. They were not agents for the location of mines for the plaintiff, and had no agreement or duty in that regard. Under the rule, they were not barred from a participation in the locations of the Bonanza group made by Warner and Smith. Warner and Smith were neither agents nor employés of the plaintiff; they were neither employed, supported, transported, nor paid by it, nor by any one for it. They were independent prospectors in the Copper river country, in pursuance to an agreement previous to that made between the plaintiff and McClellan. Their locations were not made for the plaintiff, but were made for the members of the McClellan prospecting party. The evidence fails to satisfy me that the defendants, or either of them, have committed, omitted, or permitted any act in violation of a duty to the plaintiff as its agents or employés. Nor have they, or either of them, been guilty of any fraud in the transaction of business with it, or failed to recognize and observe fairly the rules of business integrity and honest dealing with it. The plaintiff has failed to establish its case by a fair preponderance of the testimony. Its evidence is not of that full, satisfactory, convincing, and unambiguous kind which will justify a court of equity in establishing a trust upon real estate where the prima facie title and possession is in another.

It is unnecessary to attempt to review every point made in the case; the court will not do so. It is my judgment that the plaintiff fails to establish such an agency as enables it to enforce a trust upon the real property in controversy, and all other questions are therefore immaterial. Let findings of fact, conclusions of law, and decree be entered in line with these conclusions.