[No. 4979.]
[No. 2402 C. A.]

HALL v. NASH ET AL.

1. Corporations—Mining Lease—Forfeiture—Rights of Stockholders.

The stockholders of a corporation, holding a lease on a mine, agreed amongst themselves to contribute towards the expense of developing the mine in proportion to the amount of stock held by each, and some of them, amongst whom was plaintiff, becoming delinquent, were notified that, unless they paid up, work would be stopped and the lease forfeited. At a stockholders' meeting the president was directed to close the mine until the delinquent stockholders paid up. The delinquent stockholders refused to pay and the lease was forfeited for failure to work the mine. The president of the company, and others, took a new lease on the mine and developed a paying mine. Held, that plaintiff, by refusing to pay his proportion of the expense of working the mine, abandoned his interest in the lease and its forfeiture and the taking of a new lease by the president of the company, and others, was no fraud upon his rights, and he was not entitled to an interest in the new lease.

2. Same—Laches.

Where a mining lease was forfeited because some of the stockholders in the leasing company refused to pay their proportion of the necessary expense of developing the mine, and the

president of the company, and others, took a new lease on the mine and expended large sums of money in working it, and, finally, developed it into a paying mine, the delinquent stockholders in the old company, who had full knowledge of the facts of the forfeiture of the old lease and execution of the new, and of the expenditures by the new lessees in working the mine, and who stood by for three years without asserting any interest, are estopped, by their laches, from asserting any claim to an interest in the new lease.

3.  Same—Laches—Fraud—Appellate Practice.

In cases involving interests in the working of mining property, where the property is liable to a sudden enormous raise in value, and the risk of loss is great, persons feeling themselves aggrieved by the acts of others should be held to the utmost diligence in instituting and prosecuting actions for relief, and, where they fail to do so, they should be permitted to recover only upon the clearest proof of fraud. And where, in such case, the record clearly and forcibly presents the question of laches, the court will take cognizance of it, although it was not raised in the trial court, nor presented in the supreme court.

*Error to the District Court of Pueblo County:*
*Hon. N. W. Dixon, Judge.*

*On Rehearing.*

Mr. W. S. O'Brien, of counsel, Mr. D. V. Burns, Mr. J. Ed. Rizer and Mr. Platt Rogers, for plaintiff in error.

Mr. Chas. E. Gast, for defendants in error.

Mr. Justice Maxwell delivered the opinion of the court.

Plaintiff in error instituted this suit December 7, 1899, in behalf of himself and other stockholders of The Matoa Leasing & Mining Company, who would come in and contribute to the expenses of the suit.

Trial to the court resulted in judgment of dismissal with costs against plaintiff, to review which is this writ of error.

The facts, as they appeared by the pleadings and the evidence, were as follows:

The Matoa Leasing & Mining Company was organized about June 1, 1896, for the purpose of acquiring a mining lease, held by one Jackson, on block 1 of the Half Moon mining claim, Cripple Creek district, Colorado; the capital stock of the company was $32,000.00, in shares of $1.00 each, full paid and non-assessable, all of which stock was issued to Jackson, as consideration for the assignment of his lease.

At or about the time the company was organized, the persons who became stockholders in the company agreed with each other, that they would pay into the treasury of the company, monthly, their proportionate shares of the operating expenses, based on the number of shares of stock held by each. Under this agreement plaintiff became a stockholder to the amount of 3,000 shares, upon which he paid monthly assessments up to and including October 15, 1896. November 6, 1896, defendant, Guy T. Nash, who was the president and business manager of the company, drew a sight draft on plaintiff, who was a resident of West Virginia, for the amount of his assessment for the period, October 15 to 31. This draft was returned unpaid. November 24, Nash telegraphed plaintiff: "Draft returned. Both pay rolls must be paid or we will close down and let Jackson force collection. Answer." No answer was made to this telegram. The same date notice of a special stockholders' meeting, to be held December 26, at the secretary's office in Pueblo, Colorado, was mailed to the stockholders of the company, the principal object of which meeting, as stated in the notice, was to consider ways and means of providing funds to pay the indebtedness of the company, and with which to continue operations. December 11, plaintiff wrote Nash that he did not wish to put any more money into the mine. December 15, Nash wrote plaintiff that the amount

due from him, December 1, was $247.92, that unless the same was paid within ten days, no work would be done on the property during the month, as required by the lease, and the lease would be lost. No reply was made to this.

The special stockholders' meeting was held, pursuant to notice, at which the holders of 22,800 shares of stock were present, or represented, plaintiff not being present or represented.

It was reported to the meeting that the unpaid indebtedness of the company, December 1, was $1,215.15; that certain stockholders were delinquent to the amount of $1,062.42, among whom was plaintiff to the amount of $247.92; that work at the mine had ceased December 15, and that, unless the shaft was sunk an additional ten or twelve feet during the month, the lease would be forfeited; that all delinquent stockholders had been notified, by registered mail, to pay up, and that, unless they did so, work would not be resumed at the mine.

The president and secretary were authorized, by the vote of the meeting, to raise money to pay the indebtedness of the company, and, if possible, to provide funds for further operations.

The action of the president in discontinuing work was ratified, and the stockholders present unanimously voted to not resume work on the shaft until all delinquents had paid up.

Within a few days of the meeting some of the stockholders of the company advanced the money required to pay the indebtedness of the company, for which the company's notes and a chattel mortgage on the personal property of the company, to secure the same, were given to the president, as trustee, which chattel mortgage was foreclosed January 26, 1897.

January 11, 1897, Nash, president of the com-

pany, surrendered the lease to the owner of the property.

Some time during the month of January or February, a new lease on block 1 of the Half Moon claim was granted to one Crow, trustee, who held the same for Nash, to the extent of two-thirds interest, the other one-third interest being held for himself and Jackson, who had been superintendent of the Matoa company at the mine. The Crow lease was operated by sub-lessees, without profitable results, until it finally fell into the hands of one Johnson, who expended large sums of money thereunder, and, finally, in the summer or fall of 1897, developed it into a paying proposition.

About this time the Crow lease was surrendered and a new lease, and a lease on an adjacent block of ground, was granted to Johnson, in which leases Nash and his associates had a 7-32 interest, from which profits were realized to the amount of $37,893.91.

Prior to the time when the lease became profitable, Nash had gratuitously divided his two-thirds interest in the Crow lease with the other stockholders in the company who had paid their assessments, in proportion to the amount which they had paid into the company.

The plaintiff, up to the time of the stockholders' meeting—December 26, 1896, was fully advised of the operations of the company, and was repeatedly urged and importuned to pay his proportion of the expenses, and notified that the lease would be lost to the company if he and others failed to pay their assessments. No attempt was made to conceal anything from him.

It is said, that the surrender of the lease was pursuant to a combination entered into between the officers and a majority of the stockholders of the company and the owner of the property, made prior to

the surrender, whereby a new lease was acquired, in fraud of the rights of plaintiff and other stockholders not in the combination, and that such surrender was unwarranted and unauthorized.

There is no evidence to connect any officer or stockholder of the company with the surrender of the lease, except Guy T. Nash, the president of the company, and we do not think the evidence sustains the contention that Nash surrendered the lease pursuant to any scheme or plan theretofore entered into between himself and the owner of the property.

The stockholders' meeting instructed the president not to resume work until the delinquent interests were paid up. This action inevitably forced a forfeiture and surrender of the lease. Therefore the surrender was made, pursuant to this action of the stockholders, made necessary and unavoidable by the delinquency of plaintiff and others, who had refused to put up any more money, and was made absolutely necessary by the refusal by all the stockholders present, or represented, at the meeting, to incur further liability.

The facts of this case clearly distinguish it from *Morgan v. King*, 27 Colo. 539, and *Glengary Co. v. Boehmer*, 28 Colo. 1, relied upon by counsel for plaintiff in error.

The action of plaintiff and other delinquent stockholders, in refusing to pay their proportion of the expenses was an abandonment, upon their part, of the enterprise. The surrender of the lease was the inevitable result of the conduct of plaintiff and other delinquent stockholders, warranted by the action of the stockholders' meeting, and not in fraud of the rights of plaintiff, or the corporation.

Prior to the meeting, plaintiff was informed that loss of the lease would be the result in the event that he and others failed to pay their proportion of the

expenses. He did not pay; he knew the result, and must be held to have acquiesced therein. He made no effort to inform himself of what had been done at the meeting, or what subsequently transpired, until a year after the meeting, when he wrote Nash, December 20, 1897: ''Please let me know what has become of our property. I suppose it was forfeited.'' At any time during the year he could have obtained full information by asking for it. He failed to do so, and, under the facts in this case, failure and omission upon his part, to make inquiry, or in any manner to attempt to obtain the information which was so easily obtainable, and which, as a reasonably diligent man, he should have obtained, he must be charged with notice of the surrender, and, by his subsequent conduct, held to have acquiesced therein and to have consented to it, and should not be allowed to question it.

In *Johnson v. Standard Mining Company*, 148 U. S. 360, it was said:

''While there is no direct and positive testimony that plaintiff had knowledge of what was taking place with respect to the title or development of the property, the circumstances were such as to put him upon inquiry, and the law is well settled, that where the question of *laches* is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry. * * * The duty of inquiry was all the more peremptory in this case, from the fact that the property, of itself, was of uncertain character, and was liable, as is most mining property, to suddenly develop an enormous increase in value.''

The undisputed facts disclose that the subject-matter of this controversy is a mining lease, that plaintiff had actual notice and knowledge of all the

facts complained of in December, 1897, and by an exercise of reasonable diligence might have had such knowledge in December, 1896; that from December, 1896, until December 7, 1899, when this suit was commenced, nothing was done, or attempted, by plaintiff to assert or enforce any right or claim against defendants, during which time the defendants and their sub-lessees incurred large risks incident to mining operations.

Where property is of a fluctuating or speculative character, the rule is, that it is the duty of the party complaining to press his claim at the earliest possible time. The applicability of this rule to mining property is recognized in *G. W. M. Co. v. W. of A. M. Co.*, 14 Colo. 90, 94, where it is said:

"It is a familiar principle that courts of equity will only grant relief in cases in which the application therefor is made promptly and without unreasonable delay, whatever may be the merits of the controversy. The necessity for the application of this rule to cases in which the subject-matter of the litigation is the right to unpatented mining property, the only value of which arises from the precious metals contained therein, is apparent. The value of such properties is always uncertain, and usually purely speculative."—Citing *Peebles v. Reading,* 8 Serg. & R. 493; *Sullivan v. Railroad Co.,* 94 U. S. 811; *Atwood v. Small,* 6 Clark & F. 356; *Ernest v. Vivian,* 33 Law J. Ch. 517; *Pollard v. Clayton,* 1 Kay & J. 480; *Oil Co. v. Marbury,* 91 U. S. 592.

In the case of *Ernest v. Vivian, supra,* upon the subject of *laches,* the vice-chancellor says:

"The subject-matter of this suit is the right to mines. Mining operations are of a peculiar character. They are an uncertain and speculative and hazardous adventure.   *   *   *   There is also a continual and increasing risk; for a mine profitable to-day may,

to-morrow, become worthless. Similar observations have repeatedly been made by other judges. Now, if a person has a just right to mines of which he is not in possession, as against those who are in possession of and working them, and if he claims to be the rightful owner (the person in possession being aware of his rights or supposed rights), if such owner, not being prevented by fraud or concealment, stands by for a long period of time, whilst those in possession are working the mines, this court will not lend him any assistance. * * * It is not equitable to allow him to wait till it is ascertained that the persons in possession have succeeded, or may have been ruined, and if the subject result in profit, to ask to put that in his pocket; if in loss, to repudiate the loss. It is not necessary, even if possible, to prove whether he acted from premeditated design or carelessness.''

See, also, *Brown v. Wilson,* 21 Colo. 309, 318, where the following quotation from *Johnson v. Standard Mining Co., supra,* is found:

''Under such circumstances, where property has been developed by the courage and energy and at the expense of the defendants, courts will look with disfavor upon the claims of those who have lain idle while awaiting the results of this development, and will require, not only clear proof of fraud, but prompt assertion of plaintiff's rights.''

The question of *laches* was not raised in the court below, and has not been presented in this court, but is so forcibly presented by the record in this case that we cannot fail to take cognizance of it, which we do, for the reason that, in cases of this nature, involving property of the character herein involved, persons feeling themselves aggrieved at the acts of others should be held to the utmost diligence in instituting and prosecuting actions for relief, and where they fail to do so, they should be permitted to recover only

upon the clearest proof of fraud, which is not apparent in this record.

We therefore conclude, that there is no evidence whatever in the record to sustain the complaint of fraud against the defendants, or any of them; that the surrender of the lease complained of was a necessary and inevitable result of the delinquency of plaintiff and other non-contributing stockholders; that such surrender was made after timely notice to plaintiff of what the result would be by reason of his failure to pay up; that it was pursuant to and authorized by the action of the stockholders' meeting; that plaintiff, by his conduct, in effect consented to this surrender; that he was charged with notice thereof and acquiesced therein, and, therefore, is estopped to question it; that, by his *laches,* he cannot be permitted to maintain this action; that defendants violated no duty they owed plaintiff, or the corporation, in acquiring an interest in the leases after the surrender of the company's lease; that the judgment is right and should be affirmed.                    *Affirmed.*

The CHIEF JUSTICE and Mr. JUSTICE GUNTER concurring.