## ELLIOTT v. ELLIOTT et al.

(Third Division.   Valdez.   June 27, 1907.)

No. 147.

**1. MINES AND MINERALS (§ 29\*)—PROPERTY.**

Mining claims on public lands are "property" in the fullest sense of the word, and may be bought, sold, transferred, mortgaged, and inherited.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 29.\*]

**2. TRUSTS (§ 101\*)—CONSTRUCTIVE TRUST—PRINCIPAL AND AGENT—PUBLIC LAND.**

If an agent locates land for himself which he ought to locate for his principal, he is in equity a trustee for his principal; and this whether the contract be oral or in writing.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 152; Dec. Dig. § 101.\*]

**3. TRUSTS (§ 107\*)—CONSTRUCTIVE TRUST—EVIDENCE.**

The burden of proof is upon one who seeks to establish a trust in a mining claim against both the record and the quiet possession of the locator or his vendees.  The court will refuse to move until the trust is clearly established in favor of the party alleging it.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 157; Dec. Dig. § 107.\*]

**4. SPECIFIC PERFORMANCE (§§ 8, 16, 28, 75, 105\*)—CONTRACTS ENFORCEABLE—LACHES.**

In order to obtain specific performance of a contract (1) its terms must be certain and precise, (2) not automatic, renewing, or perpetual in its action, (3) and it must appear that its enforcement will not work injustice or inequity, and (4) the decree does not go as a matter of course, but only as a matter of equity, (5) nor where the party demanding has been guilty of laches.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 17, 35, 36, 61–85, 210, 327; Dec. Dig. §§ 8, 16, 28, 75, 105.\*]

---

\*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

5. MINES AND MINERALS (§ 97*)—PARTNERSHIP—GRUBSTAKE CONTRACT.

A grubstake contract is an agreement between two or more persons to locate mines upon the public domain by their joint aid, effort, labor, or expense, whereby each is to acquire, by virtue of the act of location, such an interest in the mine as is agreed on in the contract. The title accrues to each as an original locator, though the location be made in the name of one or more of the parties only. Such a contract, whether oral or written, when clearly established, will be enforced in equity.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 222; Dec. Dig. § 97.*]

6. MINES AND MINERALS (§ 99*)—GRUBSTAKE CONTRACT—ACTION—LACHES.

Plaintiff sued to recover a one-half interest in certain copper mines by reason of an alleged grubstake contract with the locator. She knew of the original location, and knew where to obtain full knowledge of all the facts, but neglected for more than four years to look. In the meantime the defendants bought the mines without notice, for their fair value, and spent large sums of money in development work. Thereafter this suit was brought. *Held*, the plaintiff is barred by her long acquiescence and gross laches from relief demanded in equity.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 99.*]

7. DIVORCE (§ 322*)—JUDGMENTS—OPERATION.

The general rule seems to be that after a decree of divorce all nonvested rights dependent upon the marriage relations are terminated and cut off.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 822–825; Dec. Dig. § 322.*]

8. DIVORCE (§ 322*)—JUDGMENTS—OPERATION.

Plaintiff and defendant H. C. Elliott, were husband and wife and residents in Chicago. He desired to go to Alaska to prospect for gold. Prior to leaving Chicago in January, 1898, he made a will, in which, after certain testamentary clauses in favor of his wife, it was provided, "also, that in case I return from Alaska whatever riches I possess she shall have 50 per cent. of same to

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

3 A.R.—23

do with in her own right as she may see fit in consideration of
($400) four hundred dollars given me in cash to make trip to
Alaska." He went to Alaska, discovered and located copper
mines in the Copper River country, and thereafter returned to
Chicago. In January, 1903, in Chicago, he began a suit for di-
vorce. The wife filed a cross-bill, and upon an agreement she
obtained a divorce, which took notice of their property rights,
but did not give the wife any interest in the mines. Thereafter
the defendant Elliott sold the mines, taking stock in the pur-
chasing corporations. The purchasers spent large sums in de-
veloping the property, which proved to be valuable. Thereafter,
and in April, 1906, plaintiff began this suit to recover a 50 per
cent. interest in the mines and to declare the purchasers trustees
for her of that amount under the contract clause in the will
of 1898. *Held*, that plaintiff's rights under the contract clause
in the will of 1898 were those of a wife, and were concluded by
the decree of divorce obtained by her in 1903; that having notice
of the husband's location of the mines, and the decree of divorce
having settled their property rights without giving her any in-
terest in the mines, that decree is binding on this court, and her
prayer for trusteeship is denied.

[Ed. Note.—For other cases, see Divorce, Dec. Dig. § 322.*]

This is a suit in equity to declare a trust in the Hubbard-
Elliott copper mines on the Kotsina river, Alaska, in favor of
the plaintiff.

The amended bill alleges: That on the 14th day of August,
1894, the plaintiff and Henry Curtis Elliott were intermarried,
and were husband and wife until divorced on or about Jan-
uary 22, 1903. On the 24th day of December, 1902, defendant
Henry Curtis Elliott begun a suit for divorce against this
plaintiff in Cook county, Ill., where they had long resided.
The plaintiff filed a cross-bill for desertion, and on January
22, 1903, plaintiff obtained a divorce upon the ground of de-
sertion.

That about the month of October, 1897, at the city of
Chicago, Ill., Henry Curtis Elliott, being desirous of going

to the territory of Alaska to prospect for gold and other valuable minerals, and not having the means wherewith to outfit and pay the expenses to be incurred by him in prospecting, the plaintiff and said defendant entered into an oral agreement wherein and whereby the said defendant agreed with the plaintiff, in consideration of the advancement of $400, to be made to him by plaintiff out of her own means, that he, the defendant, should proceed to the territory of Alaska, and prospect for and take up, locate, and acquire lodes, ledges, deposits, mines, mining claims, and real property, for the joint use of himself and plaintiff, and that the plaintiff should have one-half of all properties so acquired by the said defendant at any time thereafter, and during the month of January, 1898, plaintiff, pursuant to such agreement, did advance to said defendant said sum of $400 in the said city of Chicago, and thereafter, on the 31st day of January, 1898, the said defendant Henry Curtis Elliott executed and delivered to plaintiff a certain instrument in writing, of which the following is a true copy, to wit:

"Know all men by these presents, that I, H. C. Elliott, hereby bequeath to my wife, Katherine May Elliott, all my earthly possessions that I now possess or shall possess, and that this my last will and testament shall take effect immediately after my death; also that she shall act as sole executrix without bonds; also that she shall have the entire amount of my life insurance; also that in case I return from Alaska whatever riches I possess she shall have 50 per cent. of same, to do with in her own right as she may see fit, in consideration of ($400.00) four hundred dollars given me in cash to make trip to Alaska. H. C. Elliott.

"Chicago, January 21, 1898.
"Witnesses:
   "Evelyn Reeves.
   "Walter R. Treleaven."

That the plaintiff duly performed, on her part, all of the terms and conditions of said contract to be done, observed, and performed by her.

That on February 1, 1898, Henry Curtis Elliott, herein called "locator Elliott," set out for Alaska in pursuance of such contract, and while in Seattle, Wash., on his road to Alaska, plaintiff advanced him, at his request, the further sum of $100, to aid him in the enterprise. That thereafter, and in the spring of 1898, he went to Alaska, and during said year he prospected along Elliott creek, a branch of the Kotsina river, and pursuant to said contract he discovered and located many mineral claims, and acquired other property there, and on and between the last-mentioned date and this time (the original complaint was filed April 4, 1906) the said defendant Elliott became and is the owner of a large number of mining claims in Alaska, four having been located in the month of August, 1899, and all others in the years 1900, 1901, and 1902, and all located on Elliott creek, on the Copper river.

That with the money advanced by plaintiff locator Elliott outfitted and existed while acquiring said mining claims. That plaintiff continued to reside in Chicago, 3,400 miles from Valdez, where all the property acquired was recorded, and locator Elliott concealed from plaintiff the fact of such locations. That she had not seen him from February, 1898, and that he ceased to correspond with her on December 14, 1899, and that plaintiff did not learn until December, 1905, that the said defendant had discovered, located, and acquired said property.

That without notice to plaintiff the defendant Elliott had conveyed nearly all said property to his codefendants, and that plaintiff did not learn this till December, 1905, and that no part of said property had been conveyed to plaintiff. That by quitclaim deed of October 17, 1900, locator Elliott, for a nominal consideration, conveyed a one-half interest in certain mining claims to codefendant Hubbard. That thereafter on January 30, 1904, Elliott and Hubbard conveyed to the defendant corporation, the Hubbard-Elliott Copper Mines De-

velopment Company of Alaska, certain mining claims so located by Elliott, and in consideration therefor received 1,499,-994 shares, being all but 6 shares in said corporation.

That on January 14, 1902, locator Elliott, by quitclaim deed and for a nominal consideration, conveyed an undivided one-half interest in eight certain mining claims to defendant H. P. Elliott and Antoinette M. Elliott, his father and mother. That all of said deeds were made for the purpose of defrauding the plaintiff, and that all defendants had notice of the plaintiff's right, title, and interest in said property when they received title thereto.

That at all times since the organization of the defendant corporation, locator Elliott has been a director and one of its principal officers, to wit, president. That defendants have for more than two years been in possession of such property and extracting valuable minerals therefrom. That none are able to respond in damages. Wherefore plaintiff prays for decree declaring her to be "the owner of an undivided one-half interest in all said property, that the deeds to the codefendants be set aside and held for nought," for an accounting, an injunction, a receiver, and general relief. This suit was begun by filing the original bill on April 4, 1906.

In his answer to the bill, locator Elliott admits the marriage and divorce, admits the making of the alleged contract will, but alleges that the consideration therefor was the making, executing, and delivery of the will, and that the $400 mentioned therein was expended before he left home—$257.10 in paying the premium on a $10,000 life insurance policy payable to plaintiff, a portion in payment of back assessments on another insurance policy for her, and the remainder she retained for her use during his absence from home. He denies that any part of said $400 was used by him in procuring his outfit or paying his expenses to Alaska. He denies generally the equities in the plaintiff's bill and the alleged facts upon which they are based.

For an affirmative defense he alleges: That in the month of January, 1898, he entered into a grubstake agreement with H. P. Elliott, his father, and Jonathan Elliott, his uncle. That they furnished him $600 at Chicago, to purchase his Alaska outfit and to pay his expenses, and in consideration thereof he agreed to give them one-half of all mining ground acquired by him during said year. That under that contract he went to Alaska, but neither located nor acquired any property that year. That in August, 1898, H. P. Elliott sent him an additional grubstake of $300 to purchase his outfit for prospecting for 1899. That the original outfit was entirely consumed in 1898. That in 1899, and while subsisting on the $300 so furnished by his father, he located the mining claims mentioned in the bill, the "Jack Pot," "Hobo," "Big Horn," "Anna May," and "Katherine," and that all of said claims have been since abandoned and reverted to the public domain. That in August and November, 1899, H. P. Elliott sent him an additional grubstake outfit for 1900, in the total sum of $835. That in July, 1900, he met defendant Hubbard on the Copper River trail, and entered into a prospecting agreement with him. That Hubbard furnished a horse and some supplies, and together they explored the mountains and located certain mining claims, some of which were afterwards abandoned, and some retained by them and recorded at Valdez that year. That in August and October, 1900, H. P. Elliott furnished the defendant locator Elliott, at Valdez, Alaska, an additional grubstake outfit, of the value of $811, for the year 1901. That in 1901 H. P. Elliott furnished defendant locator Elliott an additional grubstake in the sum of $664, and that in February, 1901, locator Elliott returned from Chicago, where he had been since October, 1900, to Valdez, Alaska, with a prospecting outfit furnished by his father for the year 1901, and with that outfit he and Hubbard located many of the mines in question during the summer of 1901, on Elliott creek, a branch of the

Kotsina river, an easterly fork of the Copper river. That during the months of June and July, 1902, locator Elliott and Hubbard, while subsisting on their own means, discovered and located a large number of mines in dispute; and in 1903, acting together and subsisting on their own means, Elliott and Hubbard discovered other mines named and in dispute in this litigation.

That in the fall of 1900, and also in the fall of 1901, defendant locator Elliott was in Chicago, and the facts in relation to his discovery of copper mines in Alaska were publicly and widely published in the Record-Herald and other daily papers of wide circulation in Chicago, where the plaintiff lived, and that plaintiff had notice thereof.

The other defendants deny generally the allegations of equity in plaintiff's bill, allege that their acquisition of title in the property was in good faith, without notice of plaintiff's claims, and generally follow the denials and allegations in the answer of defendant locator Elliott. The defendant corporation in its affirmative defense alleges that all of the mining claims described in plaintiff's amended complaint, and acquired by the corporation from Elliott and Hubbard were discovered and located in the years 1901 and 1902 and thereafter; that the defendant purchased in good faith, for value, after examining the abstract of title; that no claim of plaintiff appeared of record, and the defendant corporation has no notice thereof; that defendant corporation has purchased other property from other persons than the defendants and issued its stock in payment therefor; that it has sold 300,000 shares of its stock on the market to innocent purchasers without notice of plaintiff's claim; that its stockholders number 1,160; that when its stock was first offered for sale it sold at 20 cents per share; that it expended in 1904 and 1905 more than $100,000 in development work on the mines, and thereby discovered new ledges of great value; that the stock rose in consequence in

value from 20 cents until at the time of the commencement of this suit it was selling in the open market on the stock exchange in Chicago for $5 per share; that the defendant had no notice of plaintiff's claims when these matters occurred. The defendant corporation was organized under the laws of the state of Washington, with a capital stock of $1,500,000, on December 31, 1903.

The answer of Hubbard denies generally the equities of the plaintiff's bill, and for an affirmative defense alleges that in 1899 and 1900, and thereafter, he and locator Elliott located the mines in question; that Hubbard had no knowledge of plaintiff's rights or claims; that the Hubbard-Elliott Development Company was organized, and their property conveyed to it without notice, in good faith, for value; and dealings in its stock were so made without notice and in good faith. And to the same general effect is the answer of the other defendants. The reply is a general denial.

Frank D. Arthur, John A. Carson, and A. M. Cannon, for plaintiff.

E. C. Hughes, John P. Fay, and Ostrander & Donohoe, for defendants.

WICKERSHAM, District Judge. The agreements with locator Elliott upon which plaintiff bases her equitable estate were concluded in January, 1898. The mines in controversy were located in 1899, 1900, 1901, and 1902, and this suit was begun at Valdez, Alaska, on April 4, 1906.

1. Some of the mining claims in controversy are patented by the United States to the defendants; others are unpatented, but held by valid locations. Mining claims on public land are "property" in the fullest sense of the word, which may be bought, sold, transferred, mortgaged, and inherited. Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313; Belk v. Meagher, 104 U. S. 279, 26 L. Ed. 735. The character of the title thus ac-

quired is more particularly described in a leading case as follows:

"They were the discoverers of the claim. They marked its boundaries by stakes, so that they could be readily traced. They posted the required notice, which was duly recorded in compliance with the regulations of the district. They had thus done all that was necessary under the law for the acquisition of an exclusive right to the possession and enjoyment of the ground. The claim was thenceforth their property. They needed only a patent of the United States to render their title perfect, and that they could obtain at any time upon proof of what they had done in locating the claim and of subsequent expenditure to a specified amount in developing it. Until the patent issued, the government held the title in trust for the locators and t'\eir vendees." Noyes v. Mantle, 127 U. S. 348, 8 Sup. Ct. 1132, 32 L. Ed. 168.

It is upon this class of property that plaintiff seeks to fasten a trust arising out of an oral and secret contract made between her and her former husband, while the relation of husband and wife existed.

2. If an agent locates land for himself which he ought to locate for his principal, he is in equity a trustee for his principal; and this whether the contract be oral or in writing. Copper River Mining Co. v. McClellan, 2 Alaska, 134. In the case of Book v. Justice Mining Co. (C. C.) 58 Fed. 106, the court states the rule as follows:

"An oral agreement to locate a mining claim for the benefit of another need not be in writing. If a party in pursuance of such an undertaking, at the expense of another, locates the claim in his own name, he holds the legal title to the ground in trust for the benefit of the party for whom the location was made; and such party could, upon making the necessary proofs, compel the locator of the mining claim to convey the title thereof to him, although the agreement so to do was not in writing. This familiar principle has been often applied in cases where a party has entered into an oral agreement to locate mining ground for the joint benefit of himself and others, and makes a location in his own name. It has always been held that such oral agreements are not within the statute of frauds. Gore v. Mc-

Brayer, 18 Cal. 582; Moritz v. Lavelle, 77 Cal. 10, 18 Pac. 803, 11 Am. St. Rep. 229; Hirbour v. Reeding, 3 Mont. 15; Welland v. Huber, 8 Nev. 203."

3. The burden of proof is upon one who seeks to establish a trust in a mining claim against both the record and the quiet possession of the locator or his vendees. The court will refuse to move until the trust is clearly established in favor of the party alleging it. To establish the existence of a trust, the onus probandi lies on the party who alleges it. Prevost v. Gratz, 19 U. S. (6 Wheat.) 482, 5 L. Ed. 311; Dalton v. Dalton, 14 Nev. 419.

The Hubbard-Elliott mines in controversy were located in 1899, 1900, 1901, 1902. This suit was begun on April 4, 1906. The defendants remained in quiet and peaceable possession of the property for three years, under a clear, unclouded, and perfected record title. Plaintiff now seeks by this action to have that title and possession taken from the defendants by a decree of this court and transferred to her. Such a decree is an exercise of the highest civil jurisdiction of a court. It is the extreme limit of its power over property, and ought not to be entered in doubtful cases.

The bottom rule in such cases was so clearly stated in an early case in the English chancery courts that it has since been quoted and followed by the American courts:

"In the great case of Cook v. Fountain, 2 Swanst. 591, it is well said that 'there is one good, general, and infallible rule that goes to both these kinds of trusts—express and implied. It is such a general rule as never deceives; a general rule to which there is no exception, and that is this: The law never implies, the court never presumes, a trust, but in case of absolute necessity. The reason of this rule is sacred, for if the chancery do once take the liberty to construe a trust by implication of law, or to presume a trust unnecessarily, a way is open to the Lord Chancellor to construe or presume any man in England out of his estate; and so at last every case in court will become casus pro amico.'" Dalton v. Dalton, 14 Nev. 419.

Nor will a court of equity adjudge the locator of a mining claim, who is in peaceable possession under a clear record title, to be a trustee of that title and possession of another, upon an alleged prior oral or secret written contract to locate for the other, unless the case is established by full, clear, and satisfactory evidence. Hopkins v. Grimshaw, 165 U. S. 342, 17 Sup. Ct. 401, 41 L. Ed. 739, citing with approval Prevost v. Gratz, supra; Slocum v. Marshall, 2 Wash. C. C. 397, Fed. Cas. No. 12,953; Smith v. Burnham, 3 Sumn. 435, Fed. Cas. No. 13,019.

4. Plaintiff prays specific performance of her alleged contract with locator Elliott—that she have a conveyance to her of an undivided one-half interest in all mines located by him in Alaska, in accordance with the terms of her contract. Of the established doctrines and settled principles of equity which apply to and control the action of the courts in this class of cases are the following:

(1) In order to obtain the specific performance of a contract, its terms should be so precise as that neither party can reasonably misunderstand them. If the contract be vague and uncertain, a court of equity will not enforce it, but leave the party to his legal remedy. Colson v. Thompson, 15 U. S. (2 Wheat.) 336, 4 L. Ed. 253; Preston v. Preston, 95 U. S. 200, 24 L. Ed. 494; Burnett v. Kullak, 76 Cal. 535, 18 Pac. 401; Smith v. Taylor, 82 Cal. 533, 23 Pac. 217; Stanton v. Singleton, 126 Cal. 657, 664, 59 Pac. 146, 47 L. R. A. 334; Odell v. Morin, 5 Or. 96.

(2) Equity will not specifically enforce performance of a contract which is automatic, renewing, and perpetual in its action upon the defendant. Marble Co. v. Ripley, 77 U. S. (10 Wall.) 339, 358, 19 L. Ed. 955; Texas Ry. Co. v. Marshall, 136 U. S. 393, 407, 10 Sup. Ct. 846, 34 L. Ed. 385; Ross v. U. P. Ry. Co., Fed. Cas. No. 12,080; Morrison v. Rossignol, 5 Cal. 65; Stanton v. Singleton, 126 Cal. 657, 665, 59 Pac. 146, 47 L. R. A. 334; Clarno v. Grayson, 30 Or. 111, 46 Pac. 426.

(3) It must appear that specific enforcement will work no hardship or injustice; for, if that result would follow, the court will leave the parties to their remedies at law. Willard v. Tayloe, 75 U. S. (8 Wall.) 557, 567, 19 L. Ed. 501; Cathcart v. Robinson, 30 U. S. (5 Pet.) 264, 8 L. Ed. 120; Randolph v. Quidnick Co., 135 U. S. 457, 10 Sup. Ct. 655, 34 L. Ed. 200; Agard v. Valencia, 39 Cal. 292, 303; Miller v. Butterfield, 79 Cal. 62, 21 Pac. 543; Prince v. Lamb, 128 Cal. 120, 129, 60 Pac. 689; Pomeroy on Cont. § 175.

(4) A decree for the specific performance of a contract does not go, as a matter of course, but is granted or withheld according as equity and justice seem to demand in view of all the circumstances of the case. Pratt v. Carroll, 8 Cranch, 471, 3 L. Ed. 627; Holt v. Rogers, 8 Pet. 420, 8 L. Ed. 995; Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501; Hennessey v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500; McCabe v. Matthews, 155 U. S. 550, 15 Sup. Ct. 190, 39 L. Ed. 256.

(5) A contract will not be specifically enforced where the party seeking equitable relief has slept on his rights or been guilty of laches. Johnston v. Standard Min. Co., 148 U. S. 360, 371, 13 Sup. Ct. 585, 37 L. Ed. 480.

5. Plaintiff bases her appeal to equity upon an oral and a written contract with locator Elliott. The evidence in support of the alleged oral contract is conflicting. The plaintiff asserts it; the locator denies it. In view of the rule that plaintiff must support her allegation by a fair preponderance of the proof, it is my judgment that there is a failure to establish the oral contract. The oral negotiations were merely preliminary to the written will contract of January 31, 1898, in which they merged.

It being conceded that locator Elliott wrote, signed, and delivered to the plaintiff the writing of January 31, 1898, its effect in this suit must be determined. It was intended, first,

as the last will and testament of the husband, then leaving home for a distant and dangerous prospecting journey into the mountains and mining camps of Alaska; second, he promised to divide his riches with his wife upon his return. In so far as it is the will of the maker, it need not be further considered, for nothing is claimed by the plaintiff under that part of the writing. The maker is yet alive, and may revoke it before he dies. The contract clause alone is of importance.

After the testamentary clause in the writing it was then added:

"Also that in case I return from Alaska whatever riches I possess she shall have 50 per cent. of same to do with in her own right as she may see fit in consideration of ($400.00) four hundred dollars given me in cash to make trip to Alaska."

That writing did not constitute a mining or other partnership agreement. There was no provision for future advances, or for the division of profits or losses. Nor did it constitute a grubstake contract for the joint location of mines in Alaska or elsewhere. A grubstake contract is an agreement between two or more persons to locate mines upon the public domain by their joint aid, effort, labor, or expense, whereby each is to acquire, by virtue of the act of location, such an interest in the mine as is agreed on in the contract. The title accrues to each as an original locator, though the location be made in the name of one or more of the parties only. Each party named in the grubstake contract not named in the location notice becomes, nevertheless, an equitable owner and tenant in common with those named. Such a contract, whether oral or written, when clearly established, will be enforced in equity. Cascaden v. Dunbar, 2 Alaska, 408; Marks v. Gates, 2 Alaska, 519. In the writing signed by locator Elliott no mention is made of any joint interest in mines or mining claims, or of locating mines upon the public domain in Alaska, or at all. No promise is made to plaintiff in that writing that she

shall have an interest as locator in any such mines, nor is the consideration of $400 acknowledged upon any such basis. The contract did not bind Elliott to locate mines. He made no promise to locate, purchase, or acquire mines, and no single element of a grubstake mining contract can be found in the writing. He was at liberty to mine, or fish, or manufacture, or to acquire riches in any legitimate way open to him. Nor did the contract limit the parties to riches acquired in Alaska. Riches possessed by him upon his return from Alaska were covered, though they were obtained by gift, devise, descent, purchase, or in any other way. The locator Elliott was not made the agent for the plaintiff by the writing of January 31, 1898, to locate mines for her in Alaska. He made no location of mines in her name, or in his own name as her agent, under that writing. She did not become an original locator, nor acquire any title as tenant in common with her husband in the mines so located by him in Alaska, and in controversy, under that writing.

6. The contract portion of the writing of January 31, 1898, if it can be given any force at all, was a postnuptial agreement, in consideration of $400, that in case he returned "from Alaska whatever riches I possess she shall have 50 per cent. of same to do with in her own right as she may see fit." It was a promise to make her a settlement of one-half his riches at that time. It was an agreement to divide their community riches and to settle upon her her own share as her individual estate.

Plaintiff and Elliott were intermarried August 14, 1894. He went to Alaska February 2, 1898. Thereafter on December 24, 1902, at Chicago, the husband filed a bill for divorce upon the ground of desertion. The wife answered, and also filed her cross-bill for divorce on the same ground. In her answer, and affirmatively in her cross-bill, she alleged that her husband went to Alaska on February 2, 1898; that she ad-

vanced him funds with which to make the journey; that he made the agreement in writing that she should be entitled to one-half of whatever he realized from his business or discoveries in said territory; that she was to remain at his parents' home during his absence; that she did not know what success had attended his efforts in Alaska, but that she was then informed that in January, 1902 (while the litigation for divorce was then pending in the superior court of Cook county, Ill.), he was in Chicago attempting to interest capitalists in a certain copper claim, and prayed for divorce and alimony. In his answer to her cross-complaint Elliott denied that she had advanced or loaned him money to make the Alaska trip, and denied that he had agreed to divide his Alaska property with her. It appears from the testimony taken in this court that plaintiff was notified that, if she pressed her claim for alimony, charges of unfaithfulness would be made against her. The demand for alimony was abandoned, and on January 22, 1902, a decree for divorce was permitted to go by default for the wife, but without alimony, costs, or attorney's fees.

The general rule seems to be that after a divorce from the bonds of matrimony all nonvested rights dependent upon the marriage relations are terminated and cut off. 9 Am. & Eng. Ency. of Law (2d Ed.) 855.

"Unless otherwise provided by local law, a decree of divorce by a court having jurisdiction of the cause and of the parties, dissolving the bond of matrimony, puts an end to all obligations of either party to the other, and to any right which either had acquired by the marriage in the other's property, except so far as the court granting the divorce, in an exercise of an authority vested in it by the Legislature, orders property to be transferred or alimony to be paid by one party to the other. * * * Accordingly it has been generally held that a valid divorce from the bond of matrimony, for the fault of either party, cuts off the wife's right of dower, and the husband's tenancy by the curtesy, unless expressly or impliedly preserved by statute. * * * Even where the wife obtains a decree of divorce in that state [Oregon], the title in fee in one-third of the husband's real prop-

erty, which the statute declares she shall have and that the court shall decree to her, cannot vest in her without a provision to that effect in the decree of divorce." Barrett v. Failing, 111 U. S. 523, 528, 4 Sup. Ct. 598, 601, 28 L. Ed. 505; Bamford v. Bamford, 4 Or. 30; Hall v. Hall, 9 Or. 452.

In Bamford v. Bamford, supra, the Supreme Court of Oregon said:

"The present proceedings must be treated as an original suit. The decree in the suit for divorce, having become final, cannot be disturbed, nor can any further proceedings be had in that suit, unless by a suit in the nature of a bill of review. The facts stated in this complaint do not authorize the court to review that decree. It is not shown that the alleged fraud has been discovered since the trial of the divorce suit, nor that the plaintiff has discovered proof since that time. The plaintiff should have shown some sufficient excuse for not claiming the property at that time. When one seeks to open a judgment or decree, it should be shown by a statement of facts that the party applying is without fault, or that the neglect is excusable."

The rule prevails in New York:

"When the court dissolves the marriage contract at the suit of the innocent wife, it is authorized to decree the payment to her of a suitable allowance. And why is that? If any marital right continues after the divorce, the wife remains entitled to her support, and may enforce it in the ordinary way. On the contrary, the statute recognizes that, when the marriage tie is broken, and the relation ended, no future rights will remain to the wife, and no future obligations bind the husband which have their root in the marriage relation. The court is authorized to give by its decree, in the form of an allowance, a just and adequate substitute for the right of the innocent wife, which the divorce cuts off and forbids in the future. The tribunal granting the divorce investigates the husband's financial condition, takes proof of the value of his property, and then makes a suitable allowance for her life, and so puts the decree and its power in the place and room of what is lost in the future. * * * The true theory of the statute is that from the date of the decree no existing and vested rights are forfeited, except by the express mandate of the statute; but since the marriage contract ends, and the relation terminates, no future marital right or obligation can arise for or

against either. In place of them stands the decree of the court, looking beyond the bond it is about to sever, recognizing the inevitable consequences to follow the uplifted arm, and providing for the innocent wife or husband by its own mandate that reparation, which, after the decree, is possible from no other source." Matter of the Estate of Ensign, 103 N. Y. 284, 289, 290, 8 N. E. 544, 546, 57 Am. Rep. 717.

Since this court must find as a fact established by the evidence herein that the plaintiff had knowledge of the facts, upon which she now bases her right in the property sued for, at the time when the decree of divorce was entered, it follows from these authorities that the wife cannot, in this suit, have any decree based upon her rights as a wife. They were forever foreclosed by the decree of divorce. A decree in her favor, if any, must rest upon her independent and vested right in the contract with Elliott, separate from her marital rights. It must be a vested right, which was not barred by and existed after the entry of the decree of divorce. It is doubtful if she had any such right in Illinois, and if not there she cannot have it in this territory. Clarke v. Lott, 11 Ill. 105, 114, 115.

In Bishop on Marriage, Divorce and Separation, vol. 2, § 1660, the author, basing his text upon Clarke v. Lott, supra, says:

"Assuming that in general equity law the court may refuse its aid to an applicant not equitably entitled, it may after a marriage dissolution decline in a proper case to give effect to a mere agreement for a settlement. Thus, where there was an antenuptial contract between the parties and trustees, in which the intended husband covenanted to convey to the latter certain property to be held in trust, etc., and in case of his death, 'leaving the said Mary,' then to pay the same to her, with limitations over, then followed a divorce for her fault, then his death, it was held that a suit in equity for her benefit could not be maintained, to compel specific performance of the agreement. 'The marriage,' said the court, 'is dissolved; and all rights and obligations dependent on the existence of the marriage relation are extinguished.' * * * If the estate had been conveyed to the trustee in pursuance of the agreement, it is possible that her right

3 A.R.—24

to receive the income would not be lost by the divorce; but upon this question we express no opinion." Clarke v. Lott, 11 Ill. 105, 114, 115.

The same result must follow in this case. The antenuptial contract in Clarke v. Lott was based upon a marriage consideration. The postnuptial contract in this case was based on an alleged money consideration, yet the agreement of Elliott was to make the settlement on his wife, and not on the plaintiff after divorce. Her right to the settlement, if any, was a marital right, and ended with the divorce.

It is a fact, established by the evidence in this case, that out of the $400 advanced by the plaintiff to her husband $257.10 was immediately paid by her to the Home Life Insurance Company as the first annual payment upon a $10,000 life policy on his life in her favor, and possibly a portion of the remainder was used in procuring his outfit for Alaska. She received the benefit of the money paid for the life insurance at that time, and it is doubtful if moneys so paid for her use ought again to be allowed as consideration for a nonvested, contested marriage settlement. However that may be, I am constrained by the authorities to consider the alleged contract in suit freed from any question involved in their marital rights or status.

7. Without marshaling the evidence to support the conclusion, it is my judgment thereon that the plaintiff has failed to establish by clear and convincing evidence, or by a fair preponderance thereof, or at all, that she outfitted the locator Elliott, or assisted therein, except voluntarily as his wife, or that he located mines upon supplies furnished by her, or that he made any contract with her, oral or written, that she was to have any interest in mines to be located by him in Alaska. The evidence is clear and convincing that the supplies for his enterprise were furnished upon a written grubstake contract by his father, Henry Prather Elliott, and his uncle, Jonathan Elliott, and that plaintiff knew that fact. There were no mines

located by him at any time during the period which her al-
leged supplies would have covered, even if furnished by her.
Upon all these questions of fact the evidence is against her,
and the court so finds the facts.

8. In his letter from Mt. Wrangell, dated July 20, 1899
(Plaintiff's Exhibit R), locator Elliott notified the plaintiff that:

"We haven't struck it rich yet; but, like old Micawber, we have
great expectations. We have located two copper claims; but we
don't know how rich the rock is until an assay is made, and we will
have that done next fall at Valdez."

In her answer to her husband's bill for divorce, and in her
cross-bill (Plaintiff's Exhibit S), both filed by plaintiff on Jan-
uary 12, 1902, in the superior court of Cook County, Ill., she
alleged that:

"She does not know what success has attended the efforts of said
complainant in said territory of Alaska, but is informed that he
has been, during the month of January, 1902, in the city of Chicago
attempting to interest capitalists in a certain copper claim, and that
his present source of income is unknown."

In her evidence in that case, preserved in the certificate of
evidence in Plaintiff's Exhibit S, she testified as follows:

"Q. Has he been in Chicago since that time? A. I heard through
the papers that he had been here; but I didn't see him. Q. When
did you hear that he had come back; how long ago was it? A. A
year ago last winter, and this winter, that he came back. Q. How
far from his father's house did you live? A. About four, five blocks."

William E. Reeves, plaintiff's father, and one of her wit-
nesses in the divorce case, testified as follows:

"Q. Do you know that Mr. Elliott returned here a year ago? A.
Yes, sir. Q. Did you see him at that time? A. I didn't see him;
but I had business transactions through a party that I employed. I
have his signature to papers. Q. You know he was here? A. Yes,
sir."

Elliott was at home, in Chicago, with his parents, within
four or five blocks of plaintiff's residence, and personally con-

tested her right to divorce and alimony in the superior court of Cook county, during the month of January, 1902, and on the 19th day of January, 1902, three days before the signing of the decree of divorce in that case, he caused to be published in the Sunday Record-Herald, a prominent and widely read Chicago newspaper, a three-quarter page pictorial account of his success in locating the rich copper mines in question, of which publication it may at least be said that nothing was hidden under a bushel.

In paragraph 4 of her amended complaint the plaintiff alleges that at the time or just before the decree of divorce was entered, and as a part of that litigation, and in January, 1902, she made and delivered to locator Elliott a deed poll, discharging him from all claims for alimony, maintenance, or support, but expressly reserving from the waiver all claims against him for moneys advanced and her rights under the "agreement made or existing between us with relation to an interest in any discoveries of minerals made by said Elliott in Alaska."

All the mining claims in controversy were recorded at Valdez, Alaska, in the Valdez recording office. The plaintiff knew from her correspondence with locator Elliott the exact neighborhood of his labors under her alleged contract. She is presumed to know that since June 6, 1900, it was obligatory upon locators to record notices of location of mining claims in the recorder's office in the precinct where the claims are located. She had sufficient notice of these facts and the law to put a person of ordinary intelligence upon notice that whatever claims he located at Mt. Wrangell and in the vicinity of Orca, Valdez, and the Copper river would be recorded in the official records at Valdez. From the evidence the court finds as a fact that the plaintiff knew that locator Elliott was engaged in locating copper mines upon and near Elliott creek on the Copper river; that he recorded the notices thereof at Valdez; that prior to and at the time of procuring her divorce

in January, 1902, she had knowledge of such facts, and was then so far informed as to have been able by a reasonable inquiry and search of the public records at Valdez to obtain all the information contained in her bill of April 4, 1906.

"No rule is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith, and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights; or where long acquiescence in the assertion of adverse rights has occurred. * * * Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable ground for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like. Marsh v. Whitmore, 21 Wall. 178 [22 L. Ed. 482]; Landsdale v. Smith, 106 U. S. 391 [1 Sup. Ct. 350, 27 L. Ed. 219]; Norris v. Haggin, 136 U. S. 386 [10 Sup. Ct. 942, 34 L. Ed. 424]; Mackall v. Casilear, 137 U. S. 556 [11 Sup. Ct. 178, 34 L. Ed. 776]; Hanner v. Moulton, 138 U. S. 486 [11 Sup. Ct. 408, 34 L. Ed. 1032]." Hammond v. Hopkins, 143 U. S. 224, 250, 12 Sup. Ct. 418, 427, 36 L. Ed. 134.

The rule is applied strictly in mining cases. Curtis v. Lakin, 94 Fed. 252, 36 C. C. A. 222; Great West. Min. Co. v. Woodmas, 14 Colo. 90, 23 Pac. 908; Hall v. Nash, 33 Colo. 500, 81 Pac. 249; Brown v. Wilson, 21 Colo. 309, 40 Pac. 688, 52 Am. St. Rep. 228; Johnston v. Standard Min. Co., 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214. Persons having claims to mining property in the course of development are bound to the utmost diligence in enforcing them, and in such cases the doctrine of laches is relentlessly enforced. Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214; Foster v. Ry. Co., 146 U. S. 88, 13 Sup. Ct. 28, 36 L. Ed. 899; Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328. Where

a question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known to him were such as to put the duty of inquiry upon a man of ordinary intelligence. The duty of inquiry is all the more peremptory when the thing in dispute is mining property, which is of an uncertain character, and is liable to suddenly develop an enormous increase in value.

"Under such circumstances, where property has been developed by the courage and energy and at the expense of the defendants, courts will look with disfavor upon the claims of those who have lain idle while awaiting the results of this development, and will require, not only clear proof of fraud, but prompt assertion of plaintiff's rights. Felix v. Patrick, 145 U. S. 317, 334 [12 Sup. Ct. 862, 36 L. Ed. 719]; Hoyt v. Latham, 143 U. S. 553, 567 [12 Sup. Ct. 568, 36 L. Ed. 259]; Hammond v. Hopkins, 143 U. S. 224 [12 Sup. Ct. 418, 36 L. Ed. 134]; Great West. Min. Co. v. Woodmas Mining Co., 14 Colo. 90 [23 Pac. 908]." Johnston v. Standard Mining Co., 148 U. S. 360, 371, 13 Sup. Ct. 585, 589, 37 L. Ed. 480.

Even in Code states laches may bar equitable demands, though the statutes of limitation do not. Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Richards v. Mackall, 124 U. S. 183, 8 Sup. Ct. 437, 31 L. Ed. 396; Sullivan v. Portland Ry. Co., 94 U. S. 806, 24 L. Ed. 324; Willard v. Wood, 164 U. S. 502, 17 Sup. Ct. 176, 41 L. Ed. 531; Penn. Mut. Ins. Co. v. Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626; Galliher v. Caldwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738.

"Indeed, in some cases the diligence required is measured by months, rather than by years. Pollard v. Clayton, 1 Kay & Johnson, 462; Attwood v. Small, 6 Clark and Finelly, 232. And in others a delay of two, three, or four years has been held fatal. Twin Lick Oil Co. v. Marbury, 91 U. S. 587 [23 L. Ed. 328]; Haywood v. National Bank, 96 U. S. 611 [24 L. Ed. 855]; Holgate v. Eaton, 116 U. S. 33 [6 Sup. Ct. 224, 29 L. Ed. 538]; Hagerman v. Bates, 5 Colo. App. 391 [38 Pac. 1100]; Graff v. Portland Co., 12 Colo. App. 106 [54 Pac. 854]." Patterson v. Hewitt, 195 U. S. 309, 319, 25 Sup. Ct. 35, 37, 49 L. Ed. 214.

The court finds as a fact that the plaintiff knew, or could have known, and ought to have known, from the facts under her observation, at the time of her divorce litigation in January, 1902, that locator Elliott had then located, in connection with Hubbard, most of the valuable mines in controversy; that she knew where these mines were located, and could have been informed from day to day of transfers, deeds, contracts, and records in connection therewith, made by the defendant Elliott, Hubbard, the father and mother of locator Elliott, and the defendant corporation. These records were official and open notice to her, and she knew where to look for information, but did not.

Two years after plaintiff had such notice, locator Elliott and his partner Hubbard, on January 30, 1904, conveyed 30 of these mining claims to the defendant corporation, who bought for value, without notice of plaintiff's claims. The defendant corporation issued its stock, based on these and other mining properties near Copper river, Alaska, and offered it for sale. It obtained large sums of money by the sale thereof to innocent purchasers for value and without notice of plaintiff's rights, and spent a large part of the whole of such trust fund in developing the mines in controversy. That work was successful, and disclosed what is alleged by the witnesses to be rich ore bodies, whereupon the stock rose in value from 20 cents a share to several dollars a share. The capital stock of the corporation is $1,500,000, and at its present alleged valuation the property is claimed to be worth more than $10,000,000. After lying by until the stockholders had thus developed the value of the property, the plaintiff began this suit to recover one-half thereof. It would be inequitable and unjust to permit her to do so.

I find the following facts to be clearly established by the evidence in this case: That locator Elliott entered into a grubstake contract with his father, Henry Prather Elliott, and his

uncle, Jonathan Elliott, prior to leaving Chicago, on February 2, 1898, whereby they were to and did furnish him an outfit for prospecting in Alaska; that plaintiff at that time had notice of that contract and arrangement, and consented thereto; that Henry Prather Elliott thereafter from year to year furnished locator Elliott a grubstake fund under contract with him for a division of the property located; that Elliott and Hubbard located mining claims as prospecting partners, and held them as tenants in common; that the conveyances by all defendants to the defendant corporation were made in good faith, without fraud, for value, and without notice of the alleged claims or rights of the plaintiff.

For all the reasons given for denying the relief prayed for in Copper River Mining Co. v. McClellan, 2 Alaska, 134, affirmed 138 Fed. 333, 70 C. C. A. 623, and in Marks v. Gates, 2 Alaska, 519, affirmed 154 Fed. 481, 83 C. C. A. 321, 14 L. R. A. (N. S.) 317, the demand of the plaintiff in this suit is denied, and in addition because of her gross laches and long acquiescence after such notice as would have caused an ordinarily diligent person to act. It is denied, also, because the property in controversy, so far as locator Elliott had any interest, was located by him under a valid grubstake contract with his father, which fact was known to plaintiff. Johnstone v. Robinson (C. C.) 16 Fed. 903.

I find generally against the plaintiff and in favor of the defendants and each of them. Let findings of fact, conclusions of law, and decree be prepared in favor of defendants in accordance with these views.