TORRENT *v.* TORRENT.

1. FRAUD—DEEDS—TRUST DEED—CANCELLATION OF INSTRUMENTS—
EVIDENCE—SUFFICIENCY.

On a bill by the grantor to set aside a certain trust deed
on the ground that its execution was procured by false
and fraudulent representations, and that she did not fully
understand that she was conveying property claimed by
her to be her individual property as well as property be-
longing to her husband's estate, evidence *held,* insufficient
to maintain the burden of proof assumed by plaintiff.

2. SAME—TRUST DEED MUST STAND OR FALL AS WHOLE.

Since the trust deed must either stand or fall as a whole,
where the evidence is insufficient to warrant setting it
aside, plaintiff's bill will be dismissed.

Cross-appeals from Muskegon; Davis (Frank D.
M.), J., presiding. Submitted October 7, 1921.
(Docket No. 66.) Decided June 5, 1922.

Bill by Caroline Torrent against Squire E. Torrent
and others to set aside certain deeds. From the decree
rendered, plaintiff and certain defendants appeal.
Reversed, and bill dismissed.

*A. W. Penny,* for plaintiff.

*Norris, McPherson, Harrington & Waer (Arthur B.
Schaffner,* of counsel), for appealing defendants.

SHARPE, J. The plaintiff is the widow of John Tor-
rent, long a resident of Muskegon county, who died
on October 21, 1915. They were married in 1858.
He became active in the lumber business and grad-
ually acquired considerable property. In 1875 he
purchased certain real estate in the city of Muskegon,
now known as lots 5 and 6 of block 334, the title being

taken in the name of plaintiff. The consideration paid therefor was $8,000. In 1893-1894, a stone dwelling house was erected on this property, costing nearly $100,000. Opinions as to its present value range from $35,000 to $50,000. On September 28, 1908, John Torrent executed a last will and testament. By the third paragraph he bequeathed to the plaintiff all the household furniture and certain other articles of personal property. The fourth paragraph provided:

"I give, bequeath and devise to my wife, Caroline Torrent, the use and occupation for the period of her natural life, of any dwelling house in the city of Muskegon and county of Muskegon of which I shall die seized of and possessed of. The selection of such dwelling house to be made by her. And it is my will that the provisions in this instrument in regard to my wife, Caroline Torrent, shall be in lieu of dower and of all and any claims and demands of every name, nature or kind she might have or urge against my estate."

After some minor bequests, the residue of his property was left to the Michigan Trust Company of Grand Rapids and its successors, in trust, to hold and manage the estate and distribute the income thereof as therein provided. The trust company was also named as executor of the will. This will was admitted to probate in Muskegon county on December 13, 1915. On March 13, 1916, the plaintiff filed an election to take as widow under the statute. The estate was administered by the trust company, final account filed and allowed, and order assigning residue made. A representative of the trust company, in searching among the papers of the deceased, found in a vault in the residence, in which the papers of both Mr. and Mrs. Torrent were kept, a conveyance from her to him of the residence property and other real estate, dated August 9, 1898, duly witnessed and acknowledged.

This property was thereafter treated by the executor and trustee as a part of the estate.

In the meantime, on March 11, 1916, an agreement was entered into between the plaintiff and the defendants Squire Torrent, Ray H. Torrent and John Torrent, three of her children, and H. Monroe Dunham, an attorney of Grand Rapids, by which Mr. Dunham was to institute proceedings to set aside or modify the trust provision in the will. Proceedings were begun by him in the circuit court for the county of Muskegon, in chancery. Later, a bill was filed in the district court of the United States for the western district of Michigan, northern division, in which Ida M. Lange, John T. Stever and Helen Stever Everington, three of the defendants herein, who are children of Nellie Torrent, a daughter of the plaintiff and her husband, then deceased, were made plaintiffs and the trust company as executor, the plaintiff and the other heirs of the deceased were made defendants. A decree was rendered in this suit on January 11, 1917, construing the will and holding certain of the trust provisions void and of no effect. As before stated, the plaintiff had theretofore elected not to take under the will. Soon after the beginning of this suit, Mr. Dunham as her attorney filed a bill of complaint in the Muskegon circuit court to set aside the deed of the stone house property, and this was pending when the decree in the Federal court was made.

After the filing of this decree, conferences were held by all the parties in interest, or their attorneys, looking to a settlement of all matters in controversy between them relative to the estate. As a result thereof, a trust deed was executed on May 18, 1917. In it the plaintiff, in her own right and as widow of John Torrent, and all the heirs of the deceased, one of them a minor by his guardian, were first parties and the Grand Rapids Trust Company the second party.

Its length, covering more than 30 pages of the printed record, precludes our quoting it in full. All of the assets of the estate are specifically set forth in it, and these were all transferred by it to the trust company. The stone house property was included therein. By its terms, the beneficial interests under the trust thereby created were divided into 1,400 shares, represented by the respective interests of the parties, and the form of the share certificates to be issued to each of them was set forth. The plaintiff was not named in or treated as a beneficiary. The undertaking on the part of the trust company was to convert the assets of the estate into cash, then to pay the expenses of the trust, to pay to plaintiff $200 per month during her natural life, to purchase and erect a suitable monument to the memory of the deceased, and to divide and distribute the balance in conformity with the trust share certificates to be issued. In addition to the monthly payment to plaintiff, the deed provided that she should occupy the stone house property without payment of rent and that in case it should be sold the trustee should, if requested by her, construct upon other property of the estate a suitable and convenient dwelling house to cost not more than $5,000 and permit her to occupy it during her lifetime without rental therefor, or, at her option, pay to her an additional $50 per month in lieu of such occupancy. Taxes and repairs were also to be paid by the trustee. The other provisions of the trust deed are not material to the issue here presented.

The bill of complaint herein, filed on November 3, 1919, alleges that the plaintiff at the time the trust deed was executed was about 78 years of age and infirm in body, that she—

"did not know, nor was she informed, that same included her own individual property (that described in her deed to her husband) but was expressly in-

formed by said Dunham and the conspiring defendants that her individual property was not included in said instrument; that she only recently became cognizant that her said individual property was included;"

that its execution by her was procured by "false and fraudulent representations," and that such deed is a cloud upon her title to such real estate. In her prayer for relief she asks: That the deed from her to her husband, found among his papers, and the trust deed executed by her be set aside and decreed to be null and void and the trustee be required to account for all moneys received by it under the trust and the estate distributed to the persons legally entitled to the same.

The defendants Lewis Torrent, Squire E. Torrent, John Torrent, Ray H. Torrent and Russell Torrent in their answers admit the truth of the allegations in the bill and say that plaintiff is entitled to the relief prayed for. The infant Fred Torrent, appearing by his guardian, leaves plaintiff to her proofs, but denies that she is entitled to any relief. The trust company and the defendants Ida M. Lange, John Stever and Helen Stever Everington admit certain allegations in the bill but deny those on which plaintiff's claim for relief rests.

The proofs were taken in open court. The trial court found that the plaintiff signed the trust deed relying on the advice of her attorney; that she did not know that her individual property was included therein. The decree sets aside the deed of August 9, 1898, from plaintiff to her husband, reforms the trust deed to exclude therefrom the stone house property, and quiets plaintiff's title thereto. It requires plaintiff to pay to the trust company the amounts expended by it for repairs and insurance pursuant to the terms of the trust deed, amounting to $3,978.43, with interest.

It orders that the monthly payments to plaintiff of $200 provided for in the trust deed be continued. It allows plaintiff costs, including an attorney fee of $1,500. From this decree the defendants trust company, Lange, Stever and Everington appeal. Notice of appeal was also given by plaintiff.

Trust Deed. The claim of the plaintiff is thus stated:

"That Mr. Dunham without previously interviewing her concerning placing this estate in a trust, called upon this old lady with the trust deed in question, unfinished and unbound, he representing dual interests, and requested her to sign name. She did not read the instrument, neither did he read it, except in part to her. Before she signed the instrument she asked him if the trust deed interfered with her property, if he was attending to her affairs and he replied that it had nothing to do with her property and he also assured her that the signing of the trust deed would not interfere with her suit then pending to restore to her the record title to her home, lots five (5) and six (6)."

She testified:

"I remember that incident. I remember that in May, 1917, myself and my children signed a certain instrument which is known here as the 'trust deed.' Before that trust deed was signed, neither Mr. Dunham or any one else talked it over with me in regard to signing any deed or trust or anything. Mr. Dunham had not talked with me about it or ever been to the house about it. * * * When Mr. Dunham came to my house he had some paper with him. He did not say it was a trust deed. The papers were just loose papers. He said it was not finished. The paper was not bound together by eyelets as the paper shown me is, because he said he did not have it all there. I signed it. Before I signed it I said something to Mr. Dunham about signing it.

"Q. What did you say?

"A. I asked him if that interfered with my property and if he was attending to my affairs, and he said

'Oh, yes, that is all right; that has nothing to do with this, whatever.'

"*Q.* He said that had nothing to do with this?

"*A.* The signing of that trust deed or whatever it was.

"*Q.* That it had no reference to your property?

"*A.* No, it had no reference to my own property.

"*Q.* Did you later find out that some of your own property was included in that trust deed?

"*A.* I found out later on."

Ella Torrent, the wife of the defendant John, testified:

"I saw Caroline Torrent sign this instrument. * * * * She said several times to him (Dunham) 'Does this interfere with me or my property, or my home, or will it interfere with the suit that is pending in regard to my home?' and he said, 'No, not at all, it will be all taken care of.' "

John Torrent testified:

"Before that deed was signed it was not read over there to us people. We were all together all the time. The instrument as presented by Mr. Dunham was in loose leaves. It was not bound. Just portions of it were read over to us. None of the descriptions were read. When I executed the deed that evening I did not know that it contained these lots 5 and 6, being the stone residence property at the corner of Third and Webster avenue in the city of Muskegon.

"*Q.* When did you first ascertain that fact to be true?

"*A.* A short time afterwards.

"*Q.* Through whom or how?

"*A.* In looking over the trust deed, the descriptions, I seen that.

"I didn't convey that information to my mother because I didn't care to worry her about it."

This testimony, standing alone, goes far to support the claim of the plaintiff. It is contradicted by Mr. Dunham. Addie L. Cheeseman, who was called on by John Torrent to take the acknowledgment, testified

that the pages of the deed were at that time bound together as they were when put in evidence on the trial.

In view of the charge made against Mr. Dunham, a reputable attorney of Grand Rapids, and the interests of plaintiff, a woman of such advanced years, we have given more than our usual attention to the facts disclosed by this record. The events preceding and following the execution of the trust deed shed considerable light upon the transaction. The plaintiff testified:

"I tried myself personally to get an agreement with Mr. Lange and the other heirs back in the latter part of 1916 to get all of this litigation over and all the estate settled up."

When the decree of the Federal court construing the will was made, her suit to set aside the deed from her to her husband was pending. What interest she would take under the will was in dispute. On objection of plaintiff's counsel, Mr. Dunham was not permitted to testify to conversations with plaintiff before the negotiations leading up to the making of the trust agreement. He testified that he had frequent conversations with her relative to the provisions which were to be included in the deed; that Mr. Wilson, the secretary of the trust company, was with him on at least one occasion when plaintiff and several of the other heirs were present; that they were there at least two hours and Mr. Wilson explained fully the condition of the estate to them; that the homestead property was talked about and a suggestion made about building her a smaller home. (Unfortunately, the death of Mr. Wilson occurred before the trial of the cause.) He further testified that plaintiff did not consider the homestead as her individual property and that she told Mr. Wilson "she wanted all of the children to share alike." On July 30, 1917, about ten

weeks after the deed was executed, the president of the trust company wrote plaintiff:

"Under the terms of the trust agreement you are entitled to occupy your present home until it is sold, after which we are to build you a house to cost not less than $5,000 on the Webster avenue property. This, of course, would necessitate the wrecking of the present building, making it practically worthless. The lot itself is worth from $3,000 to $3,500. Of course, the house as it stands would not do for you at all. In case you relinquish your right to the new house on Webster avenue property, you are entitled to an additional $50 per month during your lifetime. This $50 a month, of course, would be subject to no liens and would be entirely at your own disposal.

"We do not want to influence you in any way regarding this matter. If you think you would rather have $50 a month than the new house we will make the sale. Of course, there is no telling when we can sell the premises you now occupy. During your occupancy of that house, of course, the $50 a month will not be paid you.

"I am inclosing herewith an order for you to sign if you wish to make this disposition of the Webster avenue property. We think the offer is a very good one but, of course, will be guided entirely by your wishes in the matter."

To this she replied on August 15, 1917:

"This is to notify you that it is my wish that the Webster avenue property be sold at a sum not less than $6,000, in which case and in case of the sale of the premises I now occupy I am to have an additional sum of fifty dollars per month during my lifetime in lieu of the use of the new house on Webster avenue."

These letters are quite convincing that on August 15th plaintiff knew that the homestead property was conveyed by the trust deed and had knowledge of the provisions in the deed for her benefit in the event that it should be sold by the trust company. The statement of her son, John Torrent, a witness in

her behalf, that he knew this property was included in the deed four days after its execution but said nothing to his mother about it is significant. It also appears that on January 11, 1918, she wrote the trust company, calling attention to the fact that it was not the intention to include in the trust deed 30 acres, the title to which was in her name, and saying that she had already conveyed some of the land by deed and sold other parts on contract, and asked that it be deeded back to her. This request was conveyed to the several heirs and by their consent a reconveyance made to her by the trust company. It is her claim that at this time she had not discovered that the homestead was included in the trust deed. John Emerson, a real estate dealer in Muskegon, testified that in July, 1917, he went to the home in company with Mr. Closterhouse, an official of the trust company in charge of its real estate, and on being informed who they were and their purpose she showed them through the rooms and the basement. He further testified:

"About a month later I got an opportunity to sell the property known as the McNiss house on Webster avenue, and I understood Mrs. Torrent had something to say whether this property should be sold or not, and I went to see her about it at that time and had a conversation with her. She said that at the time she deeded the home and the property to the Grand Rapids Trust Company, trustee of the Torrent trust; that she would receive $200 a month and that if the Torrent home was sold she was to have the home built on this property on Webster avenue, to cost $5,000, and she would have to give her consent or this property could not be sold, and I communicated this to Mr. Closterhouse and we finally got her consent to the sale of the property on Webster avenue, and it was sold for $6,000. With reference to the relation of the Grand Rapids Trust Company and herself as to her homestead property, she said that property belonged to the Grand Rapids Trust Company; that they

were paying her $200 a month and she had the privilege of living there until the property was sold, and that they must keep up the repairs on the property and pay her her money regularly each month."

He further testified that she telephoned to him about some repairs she wanted made and he took it up with the company and at its request he caused the repairs to be made. The plaintiff admitted that she approved a bill for putting electric lights in the house in October, 1917, and bills for repairs in August and November, 1918, and one for porch screens in September, 1919, and that these were all paid by the trust company.

Mr. Closterhouse testified:

"I was there a great many times during the summer of 1917. On the occasion of my looking the house over and talking with her about the homestead, Mrs. Torrent told me that Mr. Dunham had been her attorney; that she claimed she owned the house, but it had been put into the trust. She wanted the property all to go to her children, and she was then well and expected to live a few years, and she was perfectly satisfied under the conditions to have it sold or taken care of according to the terms of the trust deed. She told me she had lived in the finest house in Muskegon for a great many years and she would like to die there. We discussed with Mrs. Torrent the sale of this homestead. We received an offer from Mr. Emerson, our agent, saying that a number of business men representing a federation of social agencies desired a short time option on the property at the price of $35,000,—$10,000 down and the balance in deferred payments covering a matter of three or four or five years. I did not take that matter up with Mrs. Torrent, but we wrote a letter to all of the Torrent boys concerning the offer as to the sale of the homestead, to Lewis and John and Ray, the three spokesmen of the trust. I came to Muskegon on one of my trips and stopped in at the time the sale was being talked of and after we had written them. Mrs. Torrent felt that we would get a great deal more for the property

than $35,000; that she would dislike very much to have the property sold at that price, and wouldn't be for it at all at a price of $35,000. She was opposed to the sale of $35,000."

Counsel for plaintiff stresses the fact that plaintiff received no adequate consideration for the conveyance of her individual property to the trustee; that the allowance of $200 per month was but a fair and reasonable amount in view of her interest in the estate as widow. It is his claim that plaintiff was then entitled to the homestead property worth $50,000, the 30 acres afterwards reconveyed to her, worth $5,000, and her interest in the estate, estimated at $34,536.68. The record does not contain a copy of the inventory or other proceedings in the probate court. The first annual account of the trust company as trustee under the trust deed shows that it received from the Michigan Trust Company moneys and property of the value of $133,610.04. This included real estate of the estimated value of $124,872. If the value of the stone house property, $50,000, and the thirty acres, $5,000, be deducted, the estate property would have been worth about $78,000 and plaintiff's interest, if a third, would have been about $26,000. As a consideration for her transfer of her interest as widow, with this estimation of its value, the provisions made for her in the trust deed would have been unusually large. It must be remembered that her right to the homestead property was in dispute. Mr. Torrent's will was made in 1908, ten years after the date of the deed from her to him. It appears from the terms of the will that he then considered he owned the stone house property. That she was tired of the litigation with her children over the estate of her husband is very apparent. She was advanced in years. It would cost a large sum to keep up the stone house and to pay taxes, insurance, etc., on it. A provision se-

curing to her $200 per month and a comfortable home without expense, or $250 per month without such home, was not so unfair or unreasonable, in view of the facts stated and the further fact that the beneficiaries under the trust deed were her children or children's children, as to shock the conscience of a court of equity or indicate that her interests had not been carefully guarded when the trust deed was made.

Counsel for the defendants strongly urge that there is no evidence even tending to prove that the trust company or the defendants contesting her claim had any knowledge that she did not fully understand the terms of the trust when it was executed and that she is precluded, as to them, from making such claim. We do not find it necessary to consider this claim as in our opinion she has not maintained the burden of proof assumed by her to satisfy the court that she did not understand the terms of the written instrument admittedly executed by her. The trust deed must either stand or fall as a whole and, after a careful examination of the entire record, we feel constrained to hold that it should not be set aside. *Pierce* v. *Pierce*, 55 Mich. 629; *Dorrington* v. *Carpenter*, 171 Mich. 652; *Curtis* v. *Mueller*, 184 Mich. 148.

The decree is reversed and one may be entered here dismissing the bill of complaint, with costs to the trust company and the defendants Lange, Stever and Everington, payable out of the funds in the hands of the trust company.

FELLOWS, C. J., and WIEST, CLARK, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice STONE took no part in this decision.